UNITED STATES FIDELITY & GUARANTY COMPANY, St. Paul Mercury Insurance Company, Hartford Casualty Company, and Home Indemnity Company, Plaintiffs,

v.

MORRISON GRAIN COMPANY, INC., and Morrison Coal Company, Inc., Defendants.

No. 86–1863–C.

United States District Court, D. Kansas.

March 20, 1990.

Arthur S. Chalmers, Kahrs, Nelson, Fanning, Hite & Kellogg, and Stephen W. Kerwick, Foulston & Siefkin, Wichita, Kan., Thomas R. Hill, Overland Park, Kan., Richard I. Stephenson, Wichita, Kan., and Mitchell L. Lathrop, San Diego, Cal., for plaintiffs.

J. Stan Sexton, Hampton, Royce, Engleman & Nelson, Salina, Kan., for defendants.

## MEMORANDUM AND ORDER

CROW, District Judge.

The case comes before the court on the plaintiffs' motions for summary judgment. In this insurance coverage dispute, the insureds, Morrison Grain Company, Inc. (Morrison Grain), a dissolved Kansas corporation, and Morrison Coal Company, Inc. (Morrison Coal), a dissolved Arkansas corporation, seek a declaratory judgment that the plaintiffs, as insurers, have a duty to defend and indemnify the defendants under the respective general liability policies for environmental damage claims made against them by governmental entities. The insureds also seek a money judgment against the plaintiffs in the amount of the sums paid to settle the environmental claims and attorney's fees and expenses.

This action was commenced on October 29, 1986, by United States Fidelity & Guaranty Company (USF & G) seeking a declaratory judgment that there is no coverage under its policies for the environmental claims against the defendants. The defendants answered and counterclaimed and later successfully joined the other insurers as plaintiffs to their counterclaim. Each of the insurers has answered the counterclaim denying coverage of these claims for indemnity and defense arising from defendants' liability to the United States Environmental Protection Agency (U.S. EPA) and the Illinois Environmental Protection Agency (Illinois EPA) under the Comprehensive Environmental Response; Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601 et seq. (CERCLA), or the Illinois Environmental Protection Act, Ill.Rev.Stat. ch. 111½, par. 1001 et seq. (1987).

Each of the plaintiffs has moved for summary judgment on a number of issues with many of them common to all motions. The common issues raised include: (1) whether CERCLA response costs are damages under the policies; (2) whether the CERCLA response costs constitute property damage under the policies; (3) whether the defendants are named insureds under the respective policies; and (4) whether the pollution exclusion precludes coverage. Two of the plaintiffs, Hartford Casualty Company (Hartford) and St. Paul Mercury Insurance (St. Paul), also contend there is no proof of an "occurrence" during the policy period. As will be shown, the court believes the application of the exclusionary clause is determinative of the case, thereby making it unnecessary to discuss with any detail, or even to address, the other common issues and specific arguments of the plaintiffs.

In ruling on a motion for summary judgment, the trial court conducts a threshold inquiry of the need for a trial. Without weighing the evidence or determining credibility, the court grants summary judgment when no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–252, 106 S.Ct. at 2512.

An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. at 2510. An issue of fact is "material" if proof thereof might affect the outcome of the lawsuit as assessed from the controlling substantive law. 477 U.S. at 249, 106 S.Ct. at 2510. Factual inferences are drawn to favor the existence of triable issues, and where reasonable minds could ultimately reach different conclusions,

summary judgment is inappropriate. *See Riley v. Brown & Root, Inc.*, 896 F.2d 474 (10th Cir.1990).

The movant's initial burden under Fed.R. Civ.P. 56 is to show the absence of evidence to support the nonmoving party's case. *Windon Third Oil and Gas v. Federal Deposit Ins.*, 805 F.2d 342, 345 (10th Cir. 1986), *cert. denied* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987). The movant must specify those portions of " 'the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits if any,' " which demonstrate the absence of a genuine issue of fact. *Windon*, 805 F.2d at 345 (quoting Fed.R.Civ.P. 56(c)). It may be sufficient for the movant to establish that the alleged factual issues are without legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir.1987).

The opposing party may not rest upon mere allegations or denials in the pleadings but must set forth specific facts supported by the kinds of evidentiary materials listed in Rule 56(c). *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. The nonmoving party's evidence is deemed true and all reasonable inferences are drawn in his favor. *Windon*, 805 F.2d at 346. More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R. Civ.P. 1." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

The pretrial order in this case was filed January 31, 1990. It states therein that the case is ready for trial and that any additional discovery would not delay the trial of the case. In their response brief to Home Indemnity's motion for summary judgment, the defendants set forth on pages three through twelve a factual statement without any citations to the record to support it. (Dk. 95). As their apparent justification for the lack of citations, defendants note just before this statement that the discovery is incomplete. (Dk. 95 at 3). Defendants have never sought leave to supplement their briefs with any later discovery. Mere allegations in a brief cannot be recognized as statements of facts in a summary judgment proceeding. For purposes of these motions, the court considers the following facts to be uncontroverted and relevant:

1. Defendant Morrison Grain, a dissolved Kansas corporation, was incorporated in 1953 and remained viable until December of 1986. Milton Morrison served as president of Morrison Grain from its inception to its dissolution. Defendant Morrison Coal, a dissolved Arkansas corporation, was formed a few years before 1970 to engage in the business of strip-mining in Arkansas. Morrison Coal was a wholly-owned subsidiary of Morrison Grain. Milton Morrison, was a corporate officer of Morrison Coal.

2. In 1970, Morrison Coal entered into a joint venture agreement with Cropland Chemical Company (Cropland) forming Agro Marketing Company (Agro). By the agreement, Cropland and Morrison Coal shared the profits equally. Robert Trowbridge was the principal stockholder of Cropland.

3. Agro engaged in the business of buying, selling, handling and storing surplus agricultural chemicals, fertilizers, insecticides and related products. Robert Trowbridge supervised and managed Agro's operations at its sites in Latham and Meredosia, Illinois.

4. The chemicals stored at Latham were accumulated over a period of years. In the mid–1970's, chemicals were handled haphazardly at the Latham site. Because a substantial quantity of pesticides stored at Latham were outdated and there was little market demand for them, they were simply moved to building A at Latham. The deteriorated containers sometimes allowed the chemicals to leak, but Agro took steps to repackage those chemicals having inadequate containers.

5. Concerned that some of the chemicals being stored were banned and extremely poisonous, Mr. Bunting, who had been a salesman, general manager and vice-president of Agro, told Mr. Trowbridge sometime before 1976 that the stored chem-

icals should be disposed of in an EPA dump.

6. Sometime around 1976, approximately thirty 55-gallon drums of pesticides were shipped in two truckloads from a garage in Latham to Meredosia. Agro employees excavated two pits at the Meredosia facility and buried the pesticides. The claimed hazardous waste contamination at Meredosia was the result of this burial of the pesticides. Ronald Ioerger and Timothy Brown, the two Agro employees in charge of this dumping of pesticides, anticipated the drums would rust and leak with time.

7. Upon discovering that this dumping was taking place, Mr. Bunting asked Mr. Ioerger whether he knew the condition of the soil and subsoil in Meredosia. Mr. Ioerger said he knew and that Mr. Trowbridge had instructed him to do this. At his deposition, Mr. Ioerger testified he did not believe that when the chemicals were transported and buried that Mr. Trowbridge knew of their actions.

8. The buried drums resurfaced in 1980 or 1981. While burying the drums again, Mr. Brown observed that they had rusted.

9. Milton Morrison assumed the management of Agro in June of 1979 and hired Mr. Bunting to dispose of Agro's assets at Latham. Through the efforts of Mr. Bunting, Agro sold the Latham facilities, including the stored fertilizers and pesticides, to Norman Waters in April of 1980. Creditors forced Agro into bankruptcy later in 1980.

10. In January of 1984, Morrison Sales Company, Inc. purchased the Meredosia facilities from Vernon Houchen, the trustee in bankruptcy for Agro, and then in turn sold it to A.B. Chrisman Fertilizer Company later that same month.

11. Between June 20, 1983, and August 3, 1983, the U.S. EPA initiated and completed a clean-up of the Latham facilities pursuant to its authority under CERCLA. The U.S. EPA found several hundred tons of solid chemicals stored in buildings which were not adequately secured. One building had deteriorated to the point that access was available through several broken slats. Large quantities of fertilizers and pesticides, in liquid and solid form, had been abandoned in their disintegrating containers and buildings. The EPA removed the hazardous substances from the property and disposed of them in a proper waste site.

12. Following the clean-up, the United States of America sought recovery of the response costs under CERCLA in a civil action captioned *U.S.A. v. Robert A. Trowbridge, Cropland Chemical Corporation, Morrison Coal Company, Inc., Morrison Grain Company, Inc., and Norman R. Waters*, No. 85-3345, and filed in the United States District Court for Central District of Illinois on June 13, 1985. The response costs for Latham totalled $231,024.37. The defendants, Morrison Grain and Morrison Coal, entered into a partial consent decree with the United States filed on October 27, 1986. The defendants agreed to pay the United States the sum of $120,368.00 in settlement of the action for reimbursement of CERCLA response costs incurred in cleaning up the Latham facility. Defendants now want the plaintiffs to cover this settlement and litigation expenses under the insurance policies.

13. Morrison Grain and Morrison Coal also seek recovery of the remedial cleanup costs at Meredosia, Illinois. In October of 1985, counsel for Morrison Grain and Morrison Coal notified the U.S. EPA about the possible underground disposal of some chemicals at Meredosia. Around the same time, Mr. Brown, a former employee also reported the same information to the Illinois EPA. After being given the primary responsibility to investigate this claim, the Illinois EPA demanded Morrison Grain and Morrison Coal to investigate and clean up the Meredosia facility. To satisfy those demands, the defendants, by and through Morrison Sales Company, Inc., contracted for the removal of the buried drums incurring costs in excess of $214,000.

14. All of the policies issued by each of the plaintiffs for which coverage is claimed contain the same or similar following language:

## INSURING AGREEMENT

The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of:

Coverage A.  bodily injury or

Coverage B.  property damage

to which this insurance applies, caused by an occurrence, and the Company shall have the right and duty to defend any suit against the Insured seeking damages on account of such bodily injury or property damage....

## DEFINITIONS

When used in this policy ...:

. . . .

"occurrence" means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured;

. . . .

"property damage" means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

## EXCLUSIONS

This insurance does not apply:

. . . .

to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids, or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

15. In interrogatories submitted in the U.S. EPA civil action in Illinois, Morrison Grain and Morrison Coal were asked whether they ever purchased insurance for the facility or operations that they claim or may claim provides coverage for the liability alleged in that lawsuit. Both entities responded that they had not.

A very basic background of the liabilities and procedures under CERCLA is useful in understanding this case. Passed in 1980, CERCLA established a "Superfund" to finance the cleanup of hazardous waste sites. 42 U.S.C. § 9611. After such a site has been identified as needing remedial action, the U.S. EPA has two express statutory options. First, if the responsible party refuses or is unable to take proper action, the U.S. EPA may respond by cleaning up the site through the financial assistance of the Superfund and then bring a subsequent cost recovery action to reimburse the fund. 42 U.S.C. §§ 9604, 9607. Second, the U.S. EPA can seek an injunction to compel a cleanup or hand down its own administrative order. 42 U.S.C. § 9606. Note, *Developments—Toxic Waste Litigation*, 99 Harv.L.Rev. 1459, 1484–1486 (1986). A third option may exist where the U.S. EPA through negotiations obtains a voluntary agreement from a responsible party to clean up a site. Note, 99 Harv.L.Rev. at 1486 n. 9.

As applied to the circumstances of this case, the U.S. EPA used the first option on the Latham facility and then reached a settlement with Morrison Grain and Morrison Coal during the subsequent cost recovery action. The Illinois EPA, acting on behalf of the U.S. EPA, essentially used the third option on the Meredosia facility. Defendants now want to recover the response costs paid in the settlement reached on the Latham facility, the costs incurred in voluntarily cleaning up the Meredosia facility, and the related litigation expenses including attorney's fees. Defendants assert coverage under the comprehensive general liability (CGL) policies issued by each of the plaintiffs.

Before embarking on any analysis of the insurance policy terms, the general rules of contract construction must be revisited. Since each of the insurance policies appear to have been negotiated and signed in Kansas by representatives of Morrison Grain

and Morrison Coal, the law of Kansas will govern the contract at issue. *Commercial Union Ins. v. John Massman Contracting*, 713 F.Supp. 1403, 1404–05 (D.Kan. 1989). The construction and effect of a contract for insurance is generally a matter of law, and when the facts are admitted or uncontroverted the court may determine whether the particular policy terms are applicable. *American Media, Inc. v. Home Indemnity Co.*, 232 Kan. 737, 740, 658 P.2d 1015 (1983).

Construction of any contract begins with determining whether the challenged provision is ambiguous. Ambiguity arises when a natural and reasonable reading of the whole contract creates uncertainty or doubt about the meaning of particular terms or provisions. *Lightner v. Centennial Life Ins. Co.*, 242 Kan. 29, 35, 744 P.2d 840 (1987). If after reasonably applying the pertinent rules of construction to the face of the instrument, a genuine uncertainty as to the proper one of two or more possible meanings is produced, an ambiguity is said to exist. *Dronge v. Monarch Ins. Co. of Ohio*, 511 F.Supp. 1, 4 (D.Kan.1979). Ambiguities are not properly derived from fragmenting the written instrument. *Farm Bureau Mut. Ins. Co. v. Horinek*, 233 Kan. 175, 180, 660 P.2d 1374 (1983).

If the language is clear and unambiguous, then the contract of insurance must be enforced according to the plain, common and popular meaning of its terms. *American Media*, 232 Kan. at 740, 658 P.2d 1015. The court is not to create another agreement for the parties when the contract as written is unambiguous. *Dronge*, 511 F.Supp. at 4.

Because an insurance policy is in the nature of an adhesion contract, if its terms are ambiguous or conflicting, the construction most favorable to the insured will be adopted. *Id.* "[T]his rule does not authorize a perversion of the language, or the exercise of inventive powers for the purpose of creating an ambiguity where none exists." *Central Security Mutual Ins. Co. v. DePinto*, 235 Kan. 331, 333, 681 P.2d 15 (1984). As preparer of the contract, the insurer has the duty to make the meaning of terms clear. *American Media*, 232 Kan. at 740, 658 P.2d 1015. An insurance contract should be construed as a whole in an effort to ascertain the parties' intent from the language used, the situation of the parties, the nature of subject matter, and the purpose to be accomplished. *American Media*, 232 Kan. at 739, 658 P.2d 1015. *See Lightner*, 242 Kan. at 35, 744 P.2d 840. The parties' intent to an insurance contract is not discerned from what the insurer intended the policy to say, but it is determined from what a reasonable person in the position of the insured would understand the policy to mean. *American Media*, 232 Kan. at 740, 658 P.2d 1015.

The above rules apply with equal force to exclusionary clauses in an insurance policy. Where an insurer intends to restrict or limit coverage, the insurer must use clear and plain language which reveals the purpose of the exclusion. *DePinto*, 235 Kan. at 334, 681 P.2d 15. It is for this reason that the courts construe narrowly the exclusions to coverage. *Dronge*, 511 F.Supp. at 4.

In regards to the burden of proof, the insured must establish that the claimed loss is within the general coverage provisions. The insurer has the burden to prove the facts bringing the case within an exclusion or exception to coverage. *Dronge*, 511 F.Supp. at 4–5.

Plaintiff, St. Paul Mercury Insurance Company (St. Paul), argues for the adoption of one additional step to the respective burdens, citing *Fireman's Fund Ins. Companies v. Ex–Cell–O Corp.*, 702 F.Supp. 1317, 1328–29 (E.D.Mich.1988), and *Fischer & Porter Co. v. Liberty Mut. Ins. Co.*, 656 F.Supp. 132, 140 (E.D.Pa.1986). In both cases, the insured was given the burden of proving that the "sudden and accidental" exception to the pollution exclusion applied. The courts looked to the general rules outlined in 19 G. Couch, *Couch on Insurance 2d* § 79.385, at 338 (1983):

> In many instances, a policy exception is itself subject to exceptions or limitations. When this is the case, the insurer in proving that the loss comes within the

exception must also proceed further to show that the exception or limitation to the exception does not preclude the application of the exception. . . .

There is, however, authority that when a policy contains an exception within an exception, the insurer need not negative the internal exception; rather, the plaintiff must show that the exception from the exemption from liability applies. *See also Ex–Cell–O Corp.*, 702 F.Supp. at 1328; *Fischer & Porter Co.*, 656 F.Supp. at 140. No Kansas law on this issue has been cited or provided.

■ Kansas courts generally have allocated the respective burdens of proof to the insured and insurer consistent with the basic distinction between coverage clauses and exclusionary clauses. In other words, the insured has the burden of proving a loss of the type included in the general coverage provisions, and the insurer has burden of proving the applicability of an exclusionary clause. *Dronge*, 511 F.Supp. at 5; *Baugher v. Hartford Fire Ins. Co.*, 214 Kan. 891, 900–01, 522 P.2d 401 (1974). Since the "sudden and accidental" exception appears within the pollution exclusion, the Kansas case law would require the insurer to prove both damage from pollution and facts which disqualify the exception. Consequently, plaintiffs have the burden of proving the facts which show the discharge or release was not sudden and accidental.

CGL insurance protects the insured against a wide range of liabilities, arising from the insured's business, for unintentional and unexpected damages to the person or property of someone other than the insured. *See* Note, *Insurance Coverage for Superfund Liability: A Plain Meaning Approach to the Pollution Exclusion Clause*, 27 Washburn L.J. 161, 166 (1987). The CGL policies at issue in this case conform to a standard CGL policy drafted more than a decade before CERCLA was enacted. Presumably, the standard terms were drawn so as to address the types of liability for which businesses normally sought coverage at that time. This circumstance partly explains the difficulty the courts have had in fitting CERCLA liability within the definitions and provisions of the standard CGL policy. To no one's surprise, the subject of insurance coverage for environmental damages and CERCLA liability is flooded with decisions, widely varying in approach and result. An abundance of authority is generally desirable, except when it is extensively and sharply divided as with these issues.

## OCCURRENCE

The threshold issue is whether there has been an "occurrence" under the basic terms of the insuring agreement. As previously set forth in paragraph fourteen of the statement of uncontroverted facts, the insurers agreed to pay on behalf of the insured all damages from "bodily injury" and "property damage" for which the insured is liable and which were caused by an "occurrence." After 1966, the term "occurrence" replaced the term "accident," in the standard CGL policy as the event triggering coverage. *Id.* The "occurrence" language is generally understood to offer broader coverage than that offered by the former term, "accident." 11 G. Couch, *Couch on Insurance 2d* § 44:285 at 437 (1982). The change to occurrence-based coverage was made in response to the need for coverage against damages resulting from continued or repeated exposure. *Broadwell Realty Services v. Fidelity and Casualty Company of New York*, 218 N.J. Super. 516, 528 A.2d 76, 84 (1987); *United Pacific Insurance Company v. Van's Westlake Union, Inc.*, 34 Wash.App. 708, 664 P.2d 1262, *rev. denied*, 100 Wash.2d 1018 (1983).

Plaintiffs' policies define "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." On claims for pollution damages, the courts have also focused their determination of a covered "occurrence" upon whether the insured expected or intended the actual damages to be the ordinary consequence or result of the insured's conduct. *See e.g. City of*

*Johnstown, N.Y. v. Bankers Standard Ins.*, 877 F.2d 1146, 1149–50 (2nd Cir.1989); *American Motorists Ins. Co. v. General Host Corp.*, 667 F.Supp. 1423, 1429–30 (D.Kan.1987); *Buckeye Union Ins. Co. v. Liberty Solvents & Chemicals Co.*, 17 Ohio App.3d 127, 477 N.E.2d 1227 (1984) (and cases cited in each). Stated another way, only accidental losses are covered. *Johnstown*, 877 F.2d at 1150. The Second Circuit explains that New York courts have looked to the nexus between the act and the resulting damage and have denied coverage only when the damages flow directly and immediately from an intentional act. *Id.*

Kansas courts have not circumscribed, to the same extent as New York courts, the meaning and scope of "occurrence" or its elements, "accident" and "neither expected nor intended from the standpoint of the insured." In *Spruill Motors, Inc. v. Universal Underwriters Ins. Co.*, 212 Kan. 681, 686–87, 512 P.2d 403 (1973), the insured had been sued by Vernon Rounkles for personal injuries and damages caused by the alleged intentional acts of one of the insured's employees. The insured's employees were towing Rounkles' car back to the insured's place of business when Rounkles interfered with their repossession of his car. During this encounter, the employees drove over Rounkles' foot. Rounkles sued Spruill alleging the employees intentionally and maliciously ran over his foot. The insurer denied having any duty to defend or indemnify for two reasons, one of which was the policy definition of "occurrence." After noting that the investigation report did not show Rounkles' injury was intentionally inflicted and that the insured's employees had denied intentionally injuring Rounkles, the Kansas Supreme Court considered whether the facts supported an "occurrence":

> Defendants argue the act of Spruill's employees in taking possession of Rounkles' truck was wrongful and intentional and therefore Spruill was not covered. As we view the facts, the act of taking possession of the truck, although intentional, was not the act which caused Rounkles' personal injury. If liability for personal injury attached it was caused by the manner in which the employees were moving the truck.
>
> The policy provided that the injury must be caused by an "occurrence" which is defined as "an accident ... which results ... in bodily injury or property damage neither expected nor intended from the standpoint of the insured." The insurer's investigation report disclosed the insured neither expected nor intended bodily injury to result. Under this policy, coverage is avoided only when an act results in an intentional injury. An intentional act may result in an unintended injury. As we pointed out in *Gowing [v. Great Plains Mutual Ins. Co.*, 207 Kan. 78, 483 P.2d 1072 (1971) ], at page 82, "... the distinction between an intentional injury and an unintended injury resulting from an intentional act has been recognized by various authorities." Since the undisputed facts disclose the personal injury to Rounkles was not the intended result of Spruill's acts, the policy of insurance covered Spruill for Rounkles' personal injury.

212 Kan. at 687, 512 P.2d 403. The Kansas Supreme Court reversed the district court and directed that judgment be entered in favor of the insured for coverage under the policy.

Since *Spruill* the courts in Kansas have had other opportunities to consider what nexus must exist between the injury and causal act for the injury to be neither expected nor intended from the standpoint of the insured. The Kansas Court of Appeals in *Casualty Reciprocal Exchange v. Thomas*, 7 Kan.App.2d 718, 721, 647 P.2d 1361, *rev. denied* 231 Kan 799 (1982), held that "where an intentional act results in injuries which are a natural and probable result of the act, the injuries are intentional." The trial court was found to have appropriately relied upon the well-established presumption that a person intends the natural and probable consequences of his actions. *Id.*

A year later, the Kansas Supreme Court affirmed the denial of coverage to an insured minor who had shot another youth in

the eye with a BB gun. *Bell v. Tilton,* 234 Kan. 461, 471–72, 674 P.2d 468 (1983). The court explained that "if from the acts, circumstances, and inferences of the case, it appeared Rusty Tilton [insured] had the desire to cause the consequences of his acts or he believed the consequences were substantially certain to result, his conduct was intentional and the policy exclusion [injury which is "either expected or intended] was operative." 234 Kan. at 472, 674 P.2d 468.

Finally, Judge Theis in *General Host Corp.* found no occurrence where the insured knew its operation was causing pollution and had received complaints about it from landowners and state agencies for years. 667 F.Supp. at 1430. The reasoning in each of these decisions reflects the operation of both the maxim that everyone is constructively held to intend the natural consequences of his acts and the self-evident proposition that actions intended or anticipated cannot be accidental. *See generally Hutchinson Water Co. v. United States Fidelity & G. Co.,* 250 F.2d 892, 894 (10th Cir.1957).

It is uncontroverted that Mr. Ioerger and Mr. Brown anticipated and expected that the metal drums buried at Meredosia would eventually rust and leak the stored hazardous chemicals. It is further uncontroverted that Agro's regular course of business was to store pesticides and fertilizers at its Latham facilities. Defendants take the position that what Agro or Agro's employees knew or did is entirely separate and distinct from what the defendants, as insureds, expected or intended. Morrison Coal downplays its role in the joint venture to the point of being only the financing arm and having no input on the daily operations of Agro. Defendants raise several factual issues regarding the extent of their knowledge and involvement in Agro's activities. Basically, defendants contend they could not have expected or intended the damages since the evidence shows they did not commit or even know of the acts causing the damages. The court will postpone discussion of defendants' theory of limited knowledge and notice until it emerges again in the application of the pollution exclusion clause.

## POLLUTION EXCLUSION

In 1973, a clause was added to the standard CGL policy which excluded coverage for damages "arising out of the discharge, dispersal, release or escape ..." of "toxic chemical, ..., waste materials, ..., or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental." Faced with greater potential liability as a result of new federal environmental laws, the insurers adopted the above standard exclusion in an effort to limit their liability. Note, 27 Washburn L.J. at 170–71. By exposing them to uninsured liability for intentional pollution, this clause was also designed to motivate insureds into reducing or stopping such pollution. *Grant–Southern Iron & Metal Co. v. CNA Ins. Co.,* 669 F.Supp. 798, 800 (E.D.Mich.1986); *Broadwell Realty Services v. Fidelity and Casualty Company of New York,* 218 N.J.Super. 516, 528 A.2d 76, 85 (1987); *see also General Host Corp.,* 667 F.Supp. at 1431. In simple and plain terms, the clause essentially excludes any coverage for damages resulting from the dispersal of pollutants unless the act of dispersal was "sudden and accidental." As will be shown, a number of courts, in a quest for finding coverage, have strained the plain meaning of the terms and circumvented the obvious scope of the clause.

The early court decisions construing the pollution exclusion discerned an internal ambiguity in the policy between the possible meaning of "sudden," which had been argued by insurers to be an instantaneous discharge of pollutants, and the broad definition of "occurrence," which is found in the policy to include a continuous exposure to conditions. *See e.g. Allstate Ins. Co. v. Klock Oil Co.,* 73 A.D.2d 486, 426 N.Y.S.2d 603, 605 (1980); *Jackson Township Municipal Utilities Auth. v. Hartford Accident & Indem. Co.,* 186 N.J.Super. 156, 451 A.2d 990, 994 (1982); *Buckeye Union Ins.,* 477 N.E.2d at 1233–34; *United Pacific Ins. Co. v. Van's Westlake Union, Inc.,* 34 Wash. App. 708, 664 P.2d 1262, 1265 (1983). The

**446**

absence of any policy definition for "sudden and accidental" has been another reason for finding the phrase susceptible to more than one reasonable meaning. *See e.g. Buckeye Union Ins. Co.*, 477 N.E.2d at 1233; *Lansco. Inc. v. Dept. of Environmental Protection*, 138 N.J.Super. 275, 350 A.2d 520, 524 (1975), *aff'd*, 145 N.J.Super. 433, 368 A.2d 363 (1976). On the weight of this perceived ambiguity, these courts then called upon the time-honored rule of construction in favor of the insured and ruled that the exclusion is nothing more than a restatement of the definition of "occurrence," that is, an unexpected and unintentional event. *See e.g. Jackson Township Municipal Utilities Auth.*, 451 A.2d at 994; *Buckeye Union Ins. Co.*, 477 N.E.2d at 1234.

■ More recently, the courts have found no ambiguity in the pollution exclusion clause and have given the phrase, "sudden and accidental," its plain and simple meaning. *U.S. Fidelity and Guar. v. Star Fire Coals, Inc.*, 856 F.2d 31, 33–35 (6th Cir.1988); *Federal Ins. Co. v. Susquehanna Broadcasting Co.*, 727 F.Supp. 169, 177–78 (M.D.Pa.1989); *C.L. Hauthaway & Sons v. American Motorists Ins.*, 712 F.Supp. 265, 268–69 (D.Mass.1989); *Fireman's Fund Ins. Companies v. Ex–Cell–O Corp.*, 702 F.Supp. 1317, 1323–1326 (E.D. Mich.1988); *State of N.Y. v. Amro Realty Corp.*, 697 F.Supp. 99, 110 (N.D.N.Y.1988); *U.S. Fidelity & Guar. Co. v. Murray Ohio Mfg. Co.*, 693 F.Supp. 617, 621 (M.D.Tenn. 1988), *aff'd*, 875 F.2d 868 (6th Cir.1989); *Borden, Inc. v. Affiliated FM Ins. Co.*, 682 F.Supp. 927, 930 (S.D.Ohio 1987), *aff'd*, 865 F.2d 1267 (6th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 68, 107 L.Ed.2d 35 (1989); *American Motorists Ins. Co. v. General Host Corp.*, 667 F.Supp. 1423, 1429–30 (D.Kan.1987); *Powers Chemco, Inc. v. Federal Insurance Co.*, 74 N.Y.2d 910, 549 N.Y.S.2d 650, 548 N.E.2d 1301 (N.Y.Ct. App.1989). This court is persuaded to fall in step with this current line of decisions. Courts have aptly characterized efforts to create ambiguity as "something only a lawyer's ingenuity" could achieve, *General Host Corp.*, 667 F.Supp. at 1429, and as a "strain" upon "logic." *Waste Management of Carolinas, Inc. v. Peerless Insurance Co.*, 315 N.C. 688, 340 S.E.2d 374, 387 (1986). The common-sense meaning of simple terms should not be contorted into a vehicle for reaching a planned destination.

The operation and terms of the pollution exclusion clause are not ambiguous. Considering first its operation, the CGL policy provides coverage to "occurrences" which by definition include continuous or repeated exposures to conditions, but the policy excludes any coverage for damages caused by the discharge, release or dispersal of pollutants. There is nothing unusual or extraordinary for an insurance policy to exclude certain types of risks from its broad coverage. The pollution exclusion, however, contains an exception. "[S]udden and accidental" discharges, dispersals, or releases of pollutants are excepted from the exclusion. "Read as whole, the policy covers 'continued and repeated exposures' except for exposures to pollution; then it covers only 'sudden and accidental' events." *General Host Corp.*, 667 F.Supp. at 1429. *See also Star Fire Coals, Inc.*, 856 F.2d at 33–34.

The terms, "sudden and accidental," are unambiguous. As commonly used, the meaning of "sudden" combines both the elements of without notice or warning and quick or brief in time. *C.L. Hauthaway & Sons*, 712 F.Supp. at 268; *Murray Ohio Mfg. Co.*, 693 F.Supp. at 621. "Accidental" is typically defined from the subjective viewpoint of happening unexpectedly or by chance, while "sudden" has an objective definition. *General Host Corp.*, 667 F.Supp. at 1428. Sudden connotes "a temporal aspect of immediacy, abruptness, swiftness, quickness, instantaneousness, and brevity." *C.L. Hauthaway & Sons*, 712 F.Supp. at 268.

To divorce "sudden" of its temporal component would eviscerate it of any independent meaning or force. "If 'sudden' refers only to the individual's subjective state of mind or capacity for forethought, it adds nothing to what the term 'accidental' has already delivered...." *Id.* Nor can this court accept the proposition that the phrase, "sudden and accidental," should be

construed as an entity having but the one meaning of unexpected. Depriving "sudden" of its distinct temporal meaning and rendering it mere surplusage because of its use in conjunction with "accidental" directly contradicts Kansas law which requires a contract to be read as a whole and meaning to be given to all of its terms. If the discharge of pollutants is brief or short, unexpected or unanticipated, not gradual or sustained, and not intended or expected, then the "sudden and accidental" exception applies.

The pollution exclusion is not merely a restatement of the definition for occurrence. *Murray Ohio Mfg. Co.*, 693 F.Supp. at 621. Instead of being synonymous with unexpected and unintended, the pollution exclusion restricts coverage to accidents distinct in time and place. *Id.* As one court noted, "[u]nlike the focus of the 'occurrence' language in the policies' broad coverage provisions, the focus of the 'pollution exclusion' is *not* upon intention, expectation, or even foresight." *Waste Management*, 340 S.E.2d at 380 (emphasis in original). An even more obvious distinction between the two policy provisions is that the "occurrence" definition addresses the harm caused by the pollution while the exclusion is concerned with the act of releasing or discharging the pollutants. The only conflict between the two provisions is what is inherent and typical in the relationship between any broad coverage provision and its limiting exclusionary clauses. *See Simpson v. KFB Insurance Co. Inc.*, 209 Kan. 620, 625, 498 P.2d 71 (1972). This type of conflict does not create ambiguity.

The abandonment of pesticides and fertilizers in deteriorating buildings and the burying of similar chemicals in metal drums underground are the antithesis of acts which could be described as sudden and accidental. The storage of chemicals in deteriorating containers for indefinite and interminable periods is neither a brief nor short release and neither an unexpected nor unanticipated dispersal of pollutants. To escape the apparent preclusive effect of the pollution exclusion, defendants fall back on the same argument made in their defense of the "occurrence" language, that

is, they knew nothing about the dumping of chemicals at Meredosia or the abandonment of chemicals at Latham. Defendants contend the issue of whether the release of pollutants was "sudden and accidental" is to be determined from the insured's viewpoint or, in other words, in the same manner as whether the damages were unexpected and unintended for purposes of an "occurrence."

In support of their argument for a subjective determination of "sudden and accidental," defendants cite *General Host Corp.*, 667 F.Supp. at 1426; *Payne v. United States Fidelity & Guar. Co.*, 625 F.Supp. 1189, 1192–93 (S.D.Fla.1985) (quoting *Lansco, Inc. v. Department of Environmental Protection*, 138 N.J.Super. 275, 350 A.2d 520 (1975)); *Family Farm Mutual Insurance Co. v. Bagley*, 64 A.D.2d 1014, 409 N.Y.S.2d 294, 295–96 (1978). Each of these decisions state that whether an event is "accidental" is judged from the viewpoint of the insured. Since "accidental" refers to an unexpected release of pollutants, it necessarily follows that expectations must be judged from some perspective.

Courts have not uniformly applied the "sudden and accidental" exception from the insured's subjective viewpoint. The New York Court of Appeals recently held that the pollution exclusion precluded an insured from recovering under the CGL policy for liability arising from the intentional discharge of hazardous wastes by the prior landowners. *Powers Chemco, Inc. v. Federal Insurance Co.*, 74 N.Y.2d 910, 549 N.Y.S.2d 650, 548 N.E.2d 1301 (1989). The court found that the prior landowner's burying of hazardous wastes was not accidental under the terms of the unambiguous pollution exclusion. The court also held:

We also reject plaintiff's contention that since it was not the actual polluter, but merely inherited the problem from the prior landowner, the pollution exclusion clause cannot bar its present insurance claim. Simply put, there is nothing in the language of the pollution exclusion clause to suggest that it is not applicable

when liability is premised on the conduct of someone other than the insured.

74 N.Y.2d at 911, 549 N.Y.S.2d at 651, 548 N.E.2d at 1302. *See also Avondale Industries, Inc. v. Travelers Indem. Co.*, 894 F.2d 498, 499–500 (2nd Cir.1990). This court believes this is the appropriate approach, and when applied to the facts of the present case, would compel a finding that both releases of fertilizers and pesticides—Latham and Meredosia—were neither accidental nor sudden.

■ Even if the court were to follow the decisions cited by defendants, summary judgment on the pollution exclusion would still be proper. Noticeably absent from those decisions is any statement that the determination of whether an event is "sudden" must be made from the insured's subjective standpoint. In fact, Judge Theis expressly held that the definition of "sudden" is an objective one. *General Host Corp.*, 667 F.Supp. at 1428. The pollution exclusion does not focus on intentions or expectations, but rather it excludes coverage for damages from accidental events caused by the non-sudden release or dispersal of pollutants. *Waste Management*, 340 S.E.2d at 380. *See also Borden, Inc.*, 682 F.Supp. at 930. "If the drafters had meant 'unexpected and unintended from the standpoint of the insured,' it is reasonable to assume that they would have said so explicitly (as in the definition of 'occurrence')." *Ex–Cell–O Corp.*, 702 F.Supp. at 1326 (citation omitted). The suddenness of the discharge, release or dispersal of pollutants is to be determined objectively from the circumstances and not from the insured's point of view.

The fact that defendants may have been unaware of the release of pollutants when it occurred does not also mean the release was sudden. Defendants emphasize that from their viewpoint, as the mere financing arm to the joint venture, the abandonment and dumping was unforeseen and unexpected. Defendants also deny that either event occurred over an extended period of time or in the regular course of defendants' business. Filling thirty 55–gallon drums with liquid pesticides stored in Latham, shipping the drums in two truckloads to Meredosia, excavating two pits at Meredosia, burying the filled drums in the pits, and then reburying the drums approximately four years later when they resurfaced are not actions reasonably capable of being termed "sudden." The abandonment of pesticides and fertilizers in deteriorating buildings and containers is also not a "sudden" event. The "sudden and accidental" exception does not address how or when the insured discovers that the pollutants have been released. Since neither release was "sudden," defendants' claims do not come within the exception to the pollution exclusion.

■ As a member or the parent corporation to a member of the Agra joint venture, defendants are not in a position to separate themselves from the non-accidental acts performed by other members of the joint venture in the exercise of their authority and in the ordinary course of the joint venture's business. Under Kansas law, a joint venturer stands as both a principal and an agent to all other joint venturers " 'with an equal right of control of the means employed to carry out the common purpose of the venture.' " *Goben v. Barry*, 234 Kan. 721, 725, 676 P.2d 90 (1984) (quoting *Neighbors Construction Co., Inc. v. Seal–Wells Construction Co., Inc.*, 219 Kan. 382, 385, 548 P.2d 491 (1976)). Because for all practical purposes it is identical to a partnership, a joint venture is governed by the same rules controlling partnerships. *Goben*, 234 Kan. at 725, 676 P.2d 90. The knowledge of one partner is constructively the knowledge of all other partners. *E.F. Corporation v. Smith*, 496 F.2d 826, 830 (10th Cir.1974).

The express terms of the pollution exclusion do not preclude the application of these general partnership principles. The exclusionary clause does not state "sudden and accidental" from "the standpoint of the insured." For this reason, this case is not controlled by a line of decisions in which coverage has been extended to one partner for his vicarious liability for the other partner's assault and battery of a third person. *Jones v. Harper*, 75 N.M. 557, 408 P.2d 56 (1965); *Malanga v. Manufacturers Casu-*

*alty Ins. Co.*, 28 N.J. 220, 146 A.2d 105 (1958) (and cases cited in both). The basis of that insurance coverage is an express condition covering assault and battery "unless committed by or at the direction of the insured." *Id.* Obviously, public policy does not bar insurance coverage on a partner's vicarious liability for another partner's intentional act. *See American States Ins. Co. v. Borbor by Borbor*, 826 F.2d 888, 893 (9th Cir.1987). Because "sudden and accidental" is not expressly linked by the policy to the insured's viewpoint, the policy definition of "insured" does not control the determination of that viewpoint.

Though some of the courts have generally stated that the assessment of "accidental" under the pollution exclusion is made from the viewpoint of the insured, those decisions have not addressed the issue of imputing knowledge and actions on partners or joint venturers in making that assessment. The CGL policies expressly structure their coverage provisions to encompass all damages which are unexpected from the insured's subjective stance. When it comes to pollution damages, the CGL policies focus on the *nature* of the release or dispersal of the pollutants and do not expressly state that this *nature* is to be determined solely from the insured's actual knowledge. Since the accidental nature of a release must be determined from some perspective, the most obvious choice under most circumstances is the vantage of the insured, who typically has been directly involved in the release of pollutants. Does the judicial choice of this viewpoint also carry with it the baggage that only the insured's actual, not constructive, knowledge constitutes the viewpoint? This court believes it would be rewriting the policies to read in this baggage. Besides being supported by the policies' silence on the matter, the imputation of knowledge is consistent with the goal of the pollution exclusion to increase accountability and responsibility of the polluters. Furthermore, this is not a case where the joint venturer acted outside the scope of his authority. The daily operation responsibilities for Agra were given to the very individuals who exercised the discretion in deciding how to store and dispose of the pesticides and chemicals. Neither of the claimed events at Latham or Meredosia can be termed "unexpected" since they were simply decisions and actions anticipated to have been made in the exercise of the joint venturer's authority.

To summarize, this court first holds that the evaluation of "sudden and accidental" should be made objectively from the circumstances surrounding the actual release or discharge of the pollutants. Alternatively, the term "sudden" is objectively defined, and the release must be sudden irrespective of the viewpoint advocated. Finally, an insured's viewpoint for purposes of the pollution exclusion includes the position and knowledge of the insured's partner or joint venturer. Defendant's claims for insurance coverage are barred by the pollution exclusion.

■ Though it is unnecessary to address the plaintiffs' other arguments because of the above ruling, the court is also persuaded to follow the line of decisions holding that CERCLA response costs are not recoverable under CGL insurance. *Cincinnati Ins. Co. v. Milliken and Co.*, 857 F.2d 979, 980–81 (4th Cir.1988) (South Carolina law) (follows *Armco* and *Mraz*); *Continental Ins. v. Northeastern Pharmaceutical*, 842 F.2d 977, 986–87 (8th Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988) (en banc) (Missouri law) (cleanup costs under CERCLA are not damages); *Maryland Cas. Co. v. Armco, Inc.*, 822 F.2d 1348, 1352–54 (4th Cir.1987), *cert. denied,* 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988) (Maryland law) (costs to comply with the directives of a regulatory agency are not covered damages); *Verlan, Ltd. v. John L. Armitage & Co.*, 695 F.Supp. 950, 954–55 (N.D.Ill.1988) (Illinois law). *See Mraz v. Canadian Universal Ins. Co., Ltd.*, 804 F.2d 1325, 1329 (4th Cir.1986) (Maryland law) (response costs are economic loss, not property damages); *Contra Avondale Industries, Inc. v. Travelers Indem. Co.*, 887 F.2d 1200, 1206–07 (2nd Cir.1989) (New York law); *National Indem. Co. v. U.S. Pollution Control Inc.*, 717 F.Supp. 765, 766–67 (W.D.Okl.1989)

(Oklahoma law); *Intel Corp. v. Hartford Acc. and Indem. Co.*, 692 F.Supp. 1171, 1186–1193 (N.D.Cal.1988) (California law). As commonly used in the law, damages are distinct from equitable relief or restitution, and CERCLA likewise differentiates between clean-up costs and damages. *Verlan, Ltd.*, 695 F.Supp. at 954. Under Kansas law, the term "damages" is not ambiguous and should be given its usual meaning, even though it may be narrower than the insured would desire. Even if a dictionary definition of "damages" were to be followed, the court agrees with plaintiff USF & G that response costs are not compensation for an injury. More aptly put, particularly under the facts of this case, the response costs are the expense of preventing or mitigating the injury. Plaintiffs are entitled to summary judgment on this issue also.

IT IS THEREFORE ORDERED that the plaintiffs' motions for summary judgment are granted.