**COLONIAL TANNING CORPORATION, Plaintiff,**

v.

**HOME INDEMNITY COMPANY, Employers Insurance of Wausau, a Mutual Company, and Liberty Mutual Insurance Company, Defendants.**

No. 90–CV–900.

United States District Court, N.D. New York.

Dec. 20, 1991.

Whiteman Osterman & Hanna, Albany, N.Y. (Jean F. Gerbini, of counsel), for plaintiff.

Hiscock & Barclay, Syracuse, N.Y. (Robert A. Barrer, of counsel), for defendant Home Indem. Co.

Gulling Schimpt & Taylor, Albany (Don Gulling, of counsel), Mintz Levin Cohn Ferris Glovsky and Popeo, Boston, Mass. (Martha J. Koster, of counsel), for defendant Liberty Mut. Ins. Co.

Zelle & Larson, Waltham, Mass. (John Harding, Jr., of counsel), for defendant Employers Ins. of Wausau.

## MEMORANDUM–DECISION AND ORDER

McCURN, Chief Judge.

For the most part, the issues raised by these motions do not present uncharted waters for this court. On several previous occasions the court has been confronted with legal issues which commonly arise when an insured is seeking to have its insurance company defend and/or indemnify it in an underlying environmental proceeding. *See, e.g., State of New York v. Blank,* 745 F.Supp. 841 (N.D.N.Y.1990) (McCurn, C.J.), *stay granted,* 1991 WL 208883 1991 U.S.Dist. LEXIS 14,582 (N.D.N.Y.1991); *Becker Electronics Manufacturing Corp. v. Granite State Insurance Co.,* 86–CV–1294, 1989 WL 63671 (N.D.N.Y. June 12, 1989) (McCurn, C.J.); and *New York v. Amro Realty Corp.,* 697 F.Supp. 99 (N.D.N.Y.1988) (McCurn, C.J.), *motion for reconsideration denied,* 745 F.Supp. 832 (N.D.N.Y.1990), *aff'd in part and rev'd in part,* 936 F.2d 1420 (2d Cir. 1991). These motions differ from those previously decided by this court, however, in one significant aspect. In prior similar cases, the court has not encountered the somewhat novel issue presented here of what constitutes a suit for purposes of triggering the duty to defend under a comprehensive general liability ("CGL") insurance policy. As will be seen, this issue has been the subject of litigation in quite a few courts.[1] There is scant case law on this issue in the Second Circuit; and the New York Court of Appeals has not yet spoken on this issue either. Given the relatively undeveloped state of the law on this narrow issue, in combination with the unique facts presented herein, after hearing oral argument on November 6, 1991, the court decided that a written decision would be appropriate.

---

1. *See, e.g., Ryan v. Royal Ins. Co.,* 916 F.2d 731, 738–39 (1st Cir.1990) (and cases noted therein).

## BACKGROUND

Plaintiff Colonial Tanning Corporation is a leather tanning company located in Gloversville, New York. In September, 1986, the New York State Department of Environmental Conservation ("DEC") sent a letter to Colonial Tanning outlining two unrelated citizen complaints at Colonial Tanning's site. Those complaints were the subject of a previous meeting between Colonial Tanning and the DEC. One complaint pertained to water leaching from an on-site waste dumpster and the second pertained to possible groundwater contamination. Because the DEC engineer was unable to confirm the condition of the floor drains, Colonial Tanning agreed to excavate in the vicinity of the problem area for observation and groundwater sampling by the DEC.

Sometime thereafter, Colonial Tanning retained the law firm of Whiteman Osterman & Hanna to represent it in connection with the DEC investigation. In response to a suggestion by its counsel, Colonial Tanning searched for any CGL polices it might have purchased over the years. That search revealed that Colonial Tanning had purchased a number of CGL policies issued by three different insurance companies (the defendants in this action): Home Indemnity Company ("Home Indemnity"), Employers Insurance of Wausau, a Mutual Company ("Wausau"), and Liberty Mutual Insurance Company ("Liberty Mutual") (collectively referred to herein as the "insurers"). According to Colonial Tanning, those policies, in combination, provide coverage to Colonial Tanning from "at least" January 4, 1971 through March 26, 1989. Based upon the existence of those policies, on October 2, 1986, counsel for Colonial Tanning notified the insurers, in writing, of the DEC investigation, demanding that the insurers defend and indemnify Colonial Tanning in connection with this matter.[2] All three insurers refused.

From September, 1986, through January, 1987, counsel for Colonial Tanning received several intermittent communications from the DEC reporting on the groundwater sampling.[3] However, from January, 1987, until April, 1988, there were no further communications between the DEC and Colonial Tanning. Then, on April 21, 1988, Colonial Tanning's counsel received from the DEC a "proposed Order on Consent" ("consent order") concerning the Colonial Tanning site.[4] That consent order basically required a field investigation program to be developed and implemented, as well as requiring some type of remediation program. In addition, the consent order provided for Colonial Tanning to pay a penalty to the DEC. For reasons which were not made known to the court, that particular consent order was never executed.

On May 6, 1988, Colonial Tanning forwarded a copy of the proposed consent order to the insurers, renewing its request for defense and indemnification.[5] As had occurred on several prior occasions, the insurers rebuffed Colonial Tanning. Specifically, by letter dated October 5, 1988, Home Indemnity purported to "reserve its rights" to disclaim coverage;[6] by letter dated June 12, 1989, Wausau declined to defend "at this time;"[7] and Liberty Mutual disclaimed coverage altogether.[8] Consequently, on July 16, 1990, Colonial Tanning commenced the present declaratory judgment action. Immediately after the insurers interposed their answers, Colonial Tanning made a motion seeking partial summary judgment on the duty to defend.

---

**2.** *See,* Affidavit of Scott Fein (September 11, 1990) ("Fein Affidavit I"), Ex. B thereto.

This exhibit was submitted with respect to plaintiff's original motion for partial summary judgment argued in November, 1990; but all parties have relied upon exhibits previously submitted, so the court has deemed those prior exhibits to be part of the record on these motions as well.

**3.** Fein Affidavit I at 3, ¶ 6.

**4.** *See* Affidavit of William Studenic (August 29, 1990), Ex. B thereto.

**5.** *See* Fein Affidavit I, Exs. D and F thereto.

**6.** *Id.,* Ex. G thereto.

**7.** *Id.,* Ex. H thereto.

**8.** *See id.,* Ex. I thereto.

When that motion was filed, the DEC's actions with respect to the Colonial Tanning site consisted solely of those outlined above. Between the filing of the original motion and the date of oral argument, the DEC finally began to take further action with respect to this site. In particular, on October 10, 1990, Colonial Tanning was informed by the DEC that its site had been included in the "Registry of Inactive Hazardous Waste Disposal Sites in New York State."[9] In addition, Colonial Tanning was informed that because of that listing, service of a DEC administrative complaint against Colonial Tanning was imminent.[10] And indeed, on November 16, 1990, counsel for Colonial Tanning received the DEC complaint.[11] After learning that its site had been included on the State Inactive Hazardous Waste Registry, and that a DEC complaint was about to be served upon it, Colonial Tanning requested an adjournment to enable it to produce the complaint. The insurers all opposed an adjournment, and the court denied the request.

On November 19, 1990, just prior to the argument on Colonial Tanning's motion for partial summary judgment, counsel for Colonial Tanning provided the court with a copy of the DEC complaint. (The specific allegations of that complaint will be discussed in detail herein.) The insurers strenuously objected to the DEC complaint being made a part of the record on that motion. Although not expressly ruling on the inclusion of that document as part of the record, the court did ask that the parties focus on whether Colonial Tanning's motion should be granted "[b]ased upon the papers in front of ... [it] *without the complaint....*"[12] After hearing oral ar-

gument, the court denied Colonial Tanning's motion without prejudice to renew, based primarily upon the fact that neither the court nor the defendants had had a chance to review the DEC administrative complaint.[13] The court then agreed with Wausau that additional discovery was necessary, so it lifted the stay on discovery, ordering the same to be completed within 90 days.[14]

In January of this year, during the course of discovery, Colonial Tanning moved for a protective order and the insurers cross-moved to compel discovery. Due to the court's unavailability, and at the request of the insurers, the court referred those discovery motions to Magistrate Judge DiBianco.[15] The Magistrate Judge held that based upon the production of the DEC complaint, no additional discovery was necessary on the duty to defend issue.[16] More specifically, after discussing the duty to defend under New York law, the Magistrate Judge held:

> Based on New York law, if the court is required to decide the defense duty claim solely by reference to the underlying complaint and the applicable insurance policy provisions, then discovery beyond the DEC complaint and the insurance policies is not relevant to the duty to defend.[17]

By order dated June 17, 1991, this court held that the Magistrate Judge's order was neither clearly erroneous nor contrary to law; and thus, necessarily, that the insurers' objections and/or appeal were meritless.[18]

Heeding this court's observation that a renewed motion for partial summary judgment would be appropriate, Colonial Tan-

---

**9.** Affidavit of Scott Fein (November 5, 1990) ("Fein Affidavit II"), Ex. A thereto at 1.

**10.** *See id.* at 2, ¶ 3. *See also* Letter of Jean Gerbini to Court (November 6, 1990).

**11.** Affidavit of Laurence M. Deutsch (August 8, 1991) at 3, ¶ 8.

**12.** Affidavit of John T. Harding (September 16, 1991), Ex. B thereto (transcript of November 19, 1990 court proceeding) at 7 (emphasis added).

**13.** *Id.* at 31.

**14.** *Id.*

**15.** *See* Letter of Honorable Neal P. McCurn to all Counsel (February 12, 1991).

**16.** Deutsch Affidavit, Ex. A thereto (copy of Magistrate Judge's Order) at 6.

**17.** *Id.* at 9.

**18.** *Id.*, Ex. B thereto at 2.

ning renewed its motion seeking such relief on August 12, 1991. Once again Colonial Tanning is essentially seeking an order declaring that the insurers have a duty to defend it in the underlying DEC proceeding. All three insurers vigorously oppose this motion, and defendants Home Indemnity and Wausau cross-move for summary judgment seeking a declaration that they do not have a duty either to defend and/or indemnify Colonial Tanning. Those two insurers also seek dismissal of the complaint.

As was the case when Colonial Tanning brought its original motion for partial summary judgment, the insurers make a number of arguments as to why the duty to defend is not invoked here. The court will discuss each of those arguments in turn. The arguments of the insurers are not all the same. Therefore, prior to a discussion of each of those arguments, the insurers making that argument will be identified and where their arguments vary slightly, that too will be noted.

## DISCUSSION

### I. "Suit"

The CGL policies at issue here all contain the standard industry-wide provision that the insurer "[s]hall have the right and duty to defend any *suit* against the insured seeking damages on account of such bodily injury or property damages, . . . ."[19] The duty to defend clearly is not triggered under the language of those policies until there has been a "suit" against Colonial Tanning. It is undisputed that the word suit is not expressly defined in any of the CGL policies under which Colonial Tanning is seeking coverage. Thus, the threshold issue presented by these motions is whether there has been a suit against Colonial Tanning by the DEC within the meaning of these policies.

In reliance upon the April 19, 1991, order of Magistrate Judge DiBianco, and upon this court's subsequent order of June 17, 1991, Colonial Tanning contends that there has already been a court determination that a suit exists here. Specifically, in response to vigorous arguments by Wausau and Liberty Mutual that there is no suit,[20] Colonial Tanning asserts that, "[t]he Magistrate's decision, upheld by the Order of June 17, 1991, was expressly based on a finding that the Complaint by the State of New York evidenced a suit within the meaning of the insurance policies."[21] Colonial Tanning therefore contends that that is the law of the case and, in its view, Wausau and Liberty Mutual are not now entitled to "revisit" the suit issue.[22]

Defendant Wausau contentiously states that that assertion by Colonial Tanning is "absurd."[23] Wausau's interpretation of the Magistrate Judge's order is that he only decided the issue of whether additional discovery should be allowed in connection with the duty to defend issue. Thus, the first issue for the court's consideration is whether there has already been a determination in this litigation that a suit exists.

19. *See, e.g.,* Studenic Affidavit, Ex. D thereto (portion of Home Indemnity policy) (emphasis added).

20. Home Indemnity did not focus on the "suit" issue itself. In fact, it appears to the court that Home Indemnity is conceding the existence of a suit at least *after* November, 1990. The court bases that observation on the following statement by Home Indemnity: "[c]onsidering the *lack of an adversarial relationship* between **CO-LONIAL** and the DEC *prior to November 1990* and the lack of a demonstration that the costs for which they seek reimbursement were useful for the defense of the DEC complaint, **COLONIAL**'s instant request for indemnification of such costs should be denied." Memorandum of Law of Defendant Home Indemnity Company at 27 (emphasis added).

21. Plaintiff's Reply Memorandum of Law in Support of Motion for Partial Summary Judgment and in Opposition to the Cross–Motion of Defendant, Employers Insurance of Wausau for Summary Judgment ("Plaintiff's Reply Memorandum") at 4.

22. *Id.* at 4.

23. Defendant Employers Insurance of Wausau's Memorandum in Opposition to Colonial Tanning Corporation's Renewed Motion for Partial Summary Judgment and in Support of Wausau's Cross–Motion for Summary Judgment ("Wausau's Memorandum of Law") at 20, n. 15.

Clearly, this court did not reach that issue in November of 1990, although the court strongly suggested that it would not consider the DEC's actions prior to the service of the DEC complaint to be sufficiently adversarial to constitute a suit.[24] In addition, the court agrees with Wausau that the specific issue of whether a suit exists for purposes of the CGL policies was not before the Magistrate Judge. In fact, although the Magistrate Judge commented that "[D]efendants apparently concede that no further discovery is needed on the suit issue, . . . ." he did not go on to discuss the meaning of suit.[25] And that is understandable because the suit issue plainly was not before him on those discovery motions. Rather, the focus of the Magistrate Judge's order was the necessity of further discovery. While it appears that, based upon receipt of the DEC complaint, the Magistrate Judge may have assumed the existence of a suit, that assumption was not critical to a resolution of the motions before him.

■ Therefore, when this court held that the order of the Magistrate Judge was not clearly erroneous or contrary to law, it did so only with respect to the issues expressly before the Magistrate Judge—the discovery issues. In the court's view then, Colonial Tanning is mistaken in its belief that the existence of a suit has been previously decided in this action. It has not. So the court will now examine the suit issue based upon the present, more fully developed, record.

■ The DEC complaint is dated November 6, 1990, but counsel for Colonial Tanning did not receive that complaint until November 16, 1990.[26] Certain provisions of the complaint are worthy of mention. The first is the DEC's characterization of that proceeding as an "enforcement action."[27] The second meaningful aspect of that complaint is the nature of the relief sought therein. In addition to seeking implementation of a remedial program in connection with the alleged groundwater contamination near Colonial Tanning's site, the DEC seeks an order finding Colonial Tanning "liable" for four violations of § 17-0501 of the New York Environmental Conservation Law;[28] the imposition of a $100,-000.00 civil penalty against Colonial Tanning; and the posting of some type of security in the amount of $2,000,000.00 to ensure that the remedial investigation and feasibility study ("RI/FS") is conducted to the DEC's satisfaction.[29] The final remedy sought by the DEC is "[f]urther relief, including, but not limited to damages or response costs, . . . ."[30]

Besides receiving that complaint, it has now come to light that the DEC has had the following contacts with Colonial Tanning, which were not part of the record before the court on the prior motion for partial summary judgment. In particular, in what appears to be a direct response to

---

**24.** Harding Affidavit, Ex. A thereto (transcript of November 19, 1990 court proceeding) at 11 and 14.

**25.** Deutsch Affidavit, Ex. A thereto (copy of Magistrate Judge's Order) at 6, n. 2.

**26.** Deutsch Affidavit at 3, ¶ 8.
The court finds it curious that Colonial Tanning claims that it first received the DEC complaint on November 16, 1990, yet Colonial Tanning executed two consent orders on November 6, 1990, the same day the administrative complaint is dated. And it appears that Colonial Tanning acted on the advice of counsel as those orders were both notarized by Kevin Young, a lawyer for the law firm retained by Colonial Tanning in this matter. *See* Harding Affidavit, Ex. D thereto at 17 and Ex. E thereto at 4. While perhaps Colonial Tanning and/or its counsel did not technically "receive" the DEC complaint until November 16, 1990, the court finds it difficult to believe that Colonial Tanning entered into two consent orders pertaining to an administrative proceeding of which it had no prior knowledge. Indeed, *if* the consent orders were in fact negotiated by counsel, it is hard to believe that that task was undertaken without counsel for Colonial Tanning at least having the benefit of reviewing the administrative complaint which forms the basis for Colonial Tanning's liability, if any.

**27.** Harding Affidavit, Ex. B thereto at 1, ¶ 1.

**28.** That statute is a general prohibition against pollution.

**29.** Harding Affidavit, Ex. B thereto at 4.

**30.** *Id.* at 5, ¶ V.

the issuance of the DEC complaint, Colonial Tanning entered into two separate "orders on consent" with the DEC. Both of the consent orders were executed by Colonial Tanning's president on November 6, 1990, but one is dated November 7, 1990 and the other is dated November 21, 1990. In both consent orders, Colonial Tanning waived its right to a hearing with respect to the administrative complaint.[31] Further, although not a part of the consent orders themselves, Colonial Tanning and the DEC also agreed to stay the enforcement hearing pending Colonial Tanning's completion of its investigation and the issuance of the RI/FS.[32] In light of that stay and the consent orders, Colonial Tanning has not filed an answer or any other type of response to the DEC complaint.

Colonial Tanning was assessed and did agree to pay a $25,000.00 civil penalty, however.[33] Even though Colonial Tanning agreed to that penalty, by its very terms, the consent order entitles the DEC to pursue additional penalties in the event of noncompliance by Colonial Tanning. For example, the DEC expressly reserved its right to bring an action against Colonial Tanning for natural resource damages caused by the release or threatened release of hazardous wastes from Colonial Tanning's site.[34] The DEC also reserved its right to bring an action pertaining to wastes that are present or have migrated from the Colonial Tanning site.[35]

Two cases are particularly relevant to the court's analysis at this point. The first is the Second Circuit's decision in *Avondale Indus., Inc. v. Travelers Indem. Co.*, 887 F.2d 1200 (2nd Cir.1989), *reh'g, denied*, 894 F.2d 498 (2d Cir.1990), *cert. denied*, —— U.S. ——, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990); and the second is the decision of the First Circuit, applying New York law, in *Ryan v. Royal Ins. Co.*, 916 F.2d 731 (1st Cir.1990). Because an analysis of the suit issue is inherently fact intensive, the court

will give a fairly detailed description of the facts of these two cases, as well as discussing the general legal principles which emerged therefrom, before going on to consider their impact on the present case.

At the request of the Louisiana State Department of Environmental Quality ("DEQ"), the Louisiana Attorney General's office sent a letter to Avondale, a commercial shipbuilder, notifying it of the DEQ's intention "to take immediate action to bring about the prompt and thorough cleanup of a hazardous waste site ... and to recover all costs of remediation expended by the State ... at that site." *Avondale*, 887 F.2d at 1202 (*quoting* DEQ letter). The letter described Avondale as a "potentially responsible party" and directed that it provide the DEQ with information regarding the types of substances disposed, the location of disposal at the site, as well as certain names and dates. *Id.* The DEQ letter also notified Avondale that in the event it willfully disregarded those requests, Avondale would be subject to potential penalties of up to $25,000.00 for each day that the information was not received; and such conduct could also result in the waiver of certain defenses available under Louisiana law. Furthermore, the letter demanded that Avondale "submit a plan for remedial action at the site ... or ... pay to the Secretary the full costs of a remedial action" incurred by the state. *Id.* Lastly, the letter required Avondale to attend a meeting or face having a suit instituted against it by the DEQ. In addition to receiving that letter from the DEQ, Avondale had been named as a defendant in some private actions by citizens claiming personal injury and property damage as a result of pollutants emanating from a dump site used by Avondale.

As a result of the foregoing, Avondale contacted its insurer requesting that it defend Avondale in both the state administrative proceeding and in the private actions.

---

**31.** *Id.*, Ex. D thereto at 3, ¶ 8 and Ex. E thereto at 2, ¶ 4.

**32.** *Id.*, Ex. C thereto (Letter from Plaintiff's Counsel to DEC (December 7, 1990)).

**33.** *Id.*, Ex. E thereto at 2, ¶ I.

**34.** *Id.*, Ex. D thereto at 12, ¶ XVII(C).

**35.** *Id.*, Ex. D thereto at 13, ¶ XVII(D).

Upon the insurer's refusal, Avondale commenced a declaratory judgment action and moved for partial summary judgment on the duty to defend claim. Judge Conboy granted that motion, holding that the insurer had a duty to defend on both the public and the private actions. *Avondale Indus., Inc. v. Travelers Indem. Co.*, 697 F.Supp. 1314, 1316–18 (S.D.N.Y.1988) (private actions); *id.* at 1318–20 (DEQ action).

On appeal the Second Circuit stated that it had "little trouble" viewing the state administrative proceeding as a suit, reasoning:

> The demand letter commences a formal proceeding against Avondale, advising it that a public authority assumed an adversarial posture toward it, and that disregard of the DEQ's demands may result in the loss of substantial rights by Avondale. These strike us as the hallmarks of litigation, and are sufficiently adversarial to constitute a suit under New York law and within the meaning of the policy.

*Avondale*, 887 F.2d at 1206. The *Avondale* Court distinguished *Technicon Electronics Corp. v. American Home Assur. Co.*, 141 A.D.2d 124, 533 N.Y.S.2d 91 (2d Dep't 1988), *aff'd on other grounds*, 74 N.Y.2d 66, 544 N.Y.S.2d 531, 542 N.E.2d 1048 (1989), on its facts, explaining:

> There, in the Appellate Division's own words, '[t]he EPA letter ... merely informed Technicon of its potential liability under CERCLA [Comprehensive Environmental Response, Compensation, and Liability Act] and that the EPA was interested in discussing Technicon's voluntary participation in remedial measures. The letter was an invitation to voluntary action ...' ... A request to participate voluntarily in remedial measures is not the same as the adversarial posture as-

sumed in the coercive demand letter that Avondale received in the instant case.

*Id.* at 1206 (citation omitted). Finally, the Court persuasively reasoned:

> [c]ommon sense argues that for Travelers [the insurer] to proffer a defense now is better for it, Avondale, and the public interest in a prompt cleanup of the hazardous waste. A judicial proceeding—were Avondale to ignore the DEQ letter—plainly will sharply escalate the liability costs Avondale faces. Fundamental issues involved in the administrative proceeding will obviously affect the extent of contribution of the various generators of the waste. A 1987 Report of the Association of State Waste Management Officials found in the record indicates—consonant with what experience teaches—that a private remedial effort is quicker and less expensive than a government sponsored program....

*Id.* (citation omitted).[36]

More recently the Rhode Island District Court, applying New York law, also had occasion to address the suit issue. In *Ryan, Klimek, Ryan Partnership v. Royal Ins. Co.*, 728 F.Supp. 862 (D.R.I.1990), a case heavily relied upon by both Wausau and Liberty Mutual, the DEC letters sent to the alleged polluter stand in stark contrast to those sent in *Avondale*. The letters in *Ryan* did not include the words "demand" or "order". Nor did they threaten court action or penalties. In *Ryan* the DEC correspondence concerned proposals for cleanup of hazardous waste; they "[r]equested voluntary participation before resort to the statutory procedures which could include initiation of an adversarial suit." *Id.* at 868. After reviewing *Avondale* and *Technicon*, as well as the case law of other jurisdictions, the court granted the insurer's motion for summary judg-

---

**36.** The New York Court of Appeals has not yet had occasion to address the "suit" issue. So this court is left with the Second Circuit's decision in *Avondale*, and various other decisions by lower courts in New York, some of which will be discussed herein. The insurers Wausau and Liberty Mutual maintain that *Avondale* was wrongly decided. Liberty Mutual's Memorandum of Law at 15, n. 9; and Wausau's Memo-

randum of Law at 25, n. 17. Wausau further maintains that *Avondale* is not an accurate prediction as to how the New York Court of Appeals would decide this issue. *See* Wausau's Memorandum of Law at 25, n. 17. But, in light of the Second Circuit's clear pronouncement therein, this court need not, and will not, engage in a speculative analysis as to how the New York Court of Appeals would decide this issue.

ment, finding that the DEC's actions therein did not rise to the level of a suit.

The First Circuit, after thoroughly discussing "[t]he policy language, the decisions applying New York law, the case law elsewhere, and the theoretical underpinnings of the duty to defend," affirmed the district court's decision. *Ryan v. Royal Ins. Co.*, 916 F.2d 731, 741 (1st Cir.1990). In so doing, the Court rejected "[a] rigid suit-cum-judgment" interpretation of the policy language. *Id.* Instead the Court held that "something more than an invitation voluntarily to initiate cleanup activities is required to animate the insurer's duty [to defend]." *Id.* The *Ryan* Court explained:

> The 'something more,' we suggest, must relate to the seriousness of purpose which characterizes the government's role. *If government assumes an adversarial posture, making sufficiently clear that the force of the State will be brought promptly to bear in a way that threatens the insured with probable and imminent financial consequences, then the functional equivalent of a suit may be in progress and the insured might reasonably expect the insurer to defend.*

*Id.* (footnote omitted) (emphasis added). The Court in *Ryan* concluded its discourse on the applicable law by stating:

> To sum up, the origins and purpose of the duty to defend seem best accommodated ..., ... by focusing ... on the data most relevant to the probability of actual toxic liability: coerciveness, adversariness, the seriousness of the effort with which the government hounds an insured, and the gravity of imminent consequences.

*Id.*

The *Ryan* Court held that the "something more" was lacking there because "[e]vidence of coerciveness or a serious state enforcement effort ... was completely wanting." *Id.* at 741–42. In reaching

that conclusion, the First Circuit agreed with the district court that the DEC letters "[l]ack[ed] any significant indicia of adversariness." *Id.* at 742. The Court observed that those letters did not contain hortatory language. Furthermore, the Circuit Court noted, as did the district court, that those letters did not even mention a "demand" or an "order". *Id.* Also, the Court commented upon the fact that the DEC letters did not place the insured under any "compulsion to begin a cleanup of the site." *Id.* Finally, the Court was persuaded by the fact that the DEC had no intention of pursuing treatment, storage and disposal violations against the insured; nor did the DEC intend to cause the insured any "undue hardship". The First Circuit characterized the DEC's statements in *Ryan* as "mild," stating that they were in "marked contrast to the adversarial posture adopted by the state agency in *Avondale*, ...." *Id.* (citation omitted).

With those two differing scenarios in mind, the court will next consider the unique factual circumstances presented herein. Even though Colonial Tanning has now received the DEC complaint, Wausau and Liberty Mutual forcefully argue that that complaint is a mere "formality;" and thus there is no suit against which they must defend. The basis for that argument is that although Colonial Tanning has received the DEC complaint—a "traditional hallmark of litigation"[37]—as previously discussed, on November 6, 1990, the same date as the complaint, it also executed two consent orders. One of those orders provided, *inter alia*, that the DEC would not institute an action or proceeding for penalties so long as Colonial Tanning complied with the terms and conditions of that order.[38] Of more significance, perhaps, is the fact that Colonial Tanning agreed to pay a $25,000 civil penalty to the DEC.[39] In the second more detailed consent order, Colonial Tanning and the DEC agreed to stay the administrative proceeding pending completion of the RI/FS.[40] There is one final

---

37. *See Avondale*, 887 F.2d at 1206.

38. Harding Affidavit, Ex. E thereto, at 2, ¶ III.

39. *Id.*, Ex. E thereto at 2, ¶ 1.

40. *Id.*, Ex. D thereto at 2–3, ¶ 7.

provision of the second consent order that cannot be overlooked, though, and that is the unmistakable statement that Colonial Tanning "[a]sserts that it has agreed to undertake such work as part of its *defense* of this proceeding." [41]

Based upon the terms of those consent orders, as well as upon the relatively conciliatory manner in which the DEC dealt with Colonial Tanning prior to the issuance of the DEC complaint, Wausau and Liberty Mutual strenuously argue that no suit exists, and thus they have no duty to defend. Both of these insurers make innovative arguments as to why there is no suit here. The essence of those arguments is that because Colonial Tanning has already paid a penalty in response to the DEC complaint, and because that action has been stayed, there is nothing for the insurers to defend against. In the words of Wausau, "Colonial Tanning [is] seek[ing] an unprecedented determination that Wausau is required to 'defend' a settlement." Wausau Memorandum of Law at 20. The insurers do recognize the possibility, however, that, based upon the DEC's unequivocal reservation of rights in the consent orders, they may be called upon to defend against *future* actions. But, the insurers assert that the issue of whether they have a duty to defend with respect to such future actions is premature at this point.

After careful consideration of the relevant case law, a thorough examination of not only the DEC complaint itself, but all of the facts and circumstances relative thereto, the court is convinced that there is a suit here for purposes of the CGL policies issued by Liberty Mutual and Wausau (and hence by Home, although it does not argue this issue). In the court's view, the DEC's conduct, as manifested by the filing of a formal administrative complaint, is sufficiently adversarial and coercive so as to constitute a suit within the meaning of the policies at issue. While the DEC may have been seeking voluntary participation in the

years prior to November, 1990, clearly it was seeking "something more" when it issued the administrative complaint on November 6, 1990. As fully outlined above, in that complaint the DEC is seeking a declaration of Colonial Tanning's liability, and a fairly broad scope of relief, including monetary damages, in part, in the form of a civil penalty.

The court does not believe that the adversarial or coercive nature of this proceeding has somehow been undermined by the fact that Colonial Tanning has already, on its own, agreed to pay the civil penalty and to start a RI/FS. Indeed, if a dispute arises with respect to the latter, eventually the RI/FS submitted by Colonial Tanning could be referred to the Commissioner of the DEC or to an administrative law judge, where a hearing would be conducted.[42] Furthermore, consistent with a finding that Colonial Tanning is involved in an adversarial proceeding with the DEC, is the unequivocal reservation of rights by Colonial Tanning in one of the consent orders: "Nothing contained herein shall constitute a waiver or other relinquishment of any defense, right or remedy which may be legally available to Respondent [Colonial Tanning] with respect to any remedial program selected by the Department [DEC]." [43] And, as previously mentioned, one of the consent orders makes it absolutely clear that Colonial Tanning is engaging in the RI/FS as part of the defense of the DEC proceeding.[44] Finally, one of the consent orders gives the DEC the right to enforce the order in the event of non-compliance by Colonial Tanning.[45]

The court is persuaded that based upon the terms and conditions of the DEC complaint and the consent orders, "the force of the [DEC] will be brought promptly to bear in a way that threatens [Colonial Tanning] with probable and imminent financial consequences...." *See Ryan,* 916 F.2d at 741. Moreover, as in *Avondale,* this is a

---

**41.** *Id.,* Ex. D thereto at 2, ¶ 7 (emphasis added).

**42.** *See* Harding Affidavit, Ex. D thereto at 10, ¶ XI(10).

**43.** *Id.,* Ex. D thereto at 8–9, ¶ X.

**44.** *Id.,* Ex. D thereto at 2, ¶ 7.

**45.** *Id.,* Ex. D thereto at 12, ¶¶ XVI and XVII(B).

situation where public policy weighs in favor of requiring the insurers to provide Colonial Tanning with a defense now. Had Colonial Tanning disregarded the DEC and/or refused to enter into a consent order, the common practice for initiating a private RI/FS in this state, the liability costs to Colonial Tanning would have been drastically increased. *See Avondale*, 887 F.2d at 1206. In short, the DEC complaint, although presently stayed, contains a sufficiently serious governmental threat or effort to enforce the hazardous waste laws against Colonial Tanning so as to give rise to a suit for insurance defense purposes.

The court admits that at first glance it found somewhat persuasive the arguments by Wausau and Liberty Mutual that because Colonial Tanning paid a civil penalty as part of a consent order, there was a settlement and thus no possibility of finding a suit. In the court's opinion however a complaint, even an administrative one, inherently places the parties thereto in an adversarial relationship; especially where, as here, there is a potential for further action (such as the possibility of an administrative hearing regarding the RI/FS) by the DEC against Colonial Tanning. Further, it would be extremely difficult for the court to reconcile a finding of no suit here with the Second Circuit's *Avondale* decision wherein, based upon a demand letter, not even a formal complaint, the Court found that the state had assumed a sufficiently adversarial posture so as to warrant a finding that a suit had been commenced for purposes of the duty to defend. In reaching that conclusion, the Second Circuit noted that if the insured were to disregard the State's demand, it "may result in the loss of substantial rights by [it]." *Avondale*, 887 F.2d at 1206. The same is true here. What is more, if this court were to hold that a suit did not exist under the facts presented herein, such holding would be inconsistent with New York courts which, as the Second Circuit observed, "[a]ppear[ ] to have adopted a broad construction of the word 'suit.'" *Id.*

Lastly, the court notes that neither *County of Broome v. Aetna Casualty & Surety Co.*, Vol. 2, No. 17 Mealey's Litiga-

tion Reports Insurance (June 24, 1988 Sup. Ct. Broome Co.), *aff'd on other grounds*, 146 A.D.2d 337, 540 N.Y.S.2d 620 (3rd Dep't 1989), nor *Borg–Warner Corp. v. Liberty Mutual Ins. Co.*, Vol. 5, No. 12 Mealey's Litigation Reports Insurance (January 24, 1991 Sup.Ct. Tompkins Co.), compel a different result. In *County of Broome*, without any legal analysis whatsoever, the court held:

> The DEC proceeding is not a suit seeking damages under the policies but an administrative proceeding which seeks to have the County remedy the conditions on county-owned land.... The costs involved in such a remedial program do not come within the specified provisions of the policy.

*Id.* Besides the fact that the court in *County of Broome* did not analyze the suit issue, it appears that the focus there was on the amount of damages, and not on the definition of a suit itself. Similarly, in *Borg–Warner*, the court offered absolutely no analysis to support its holding that an administrative proceeding does not constitute a suit. Thus, Liberty Mutual and Wausau, try as they might, cannot avoid Colonial Tanning's motion for partial summary judgment on the basis that no suit exists.

## II. Pollution Exclusion

There are several other issues which one or another of the insurers raise in an effort to defeat Colonial Tanning's motion. Home Indemnity claims that it has no duty to defend because Colonial Tanning has failed to prove the terms and conditions of the relevant policies. Home Indemnity also believes that it has no duty to defend because the DEC complaint does not allege an occurrence within the meaning of the policy. Then, all three insurers make the argument that the DEC complaint does not allege damages within the context of the CGL policies. The pollution exclusion clause is another means by which all of the insurers seek to avoid liability. The court will next focus on this last issue—the pollution exclusion clause—because if the insurers are right, that the pollution exclusion

clause bars Colonial Tanning's claim, and that Colonial Tanning does not fall within the exception thereto, the other issues become moot.

Liberty Mutual is the only insurer contending that the absolute pollution exclusion clause, excluding coverage of *all* damages caused by pollution, bars Colonial Tanning's claims and precludes coverage under those policies. Because Liberty Mutual is the only insurer making this argument and because the argument pertains only to the Liberty Mutual policies in effect for some of the claimed coverage years (1986–89), the court will first address the pollution exclusion clause common to all three insurers. Then, if necessary, the court will go on to consider the absolute pollution exclusion clause relied upon exclusively by Liberty Mutual.

All of the CGL policies under which Colonial Tanning is seeking coverage contain another standard industry-wide clause, and that is what is known as the pollution exclusion clause. That provision states that the insurer has no obligation to provide coverage for:

> Bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental....*

Affidavit of Judith Sayles (September 13, 1991), Ex. B thereto (emphasis added). The highlighted language is commonly referred to as the sudden and accidental exception. Before turning to the impact of the pollution exclusion clause on the present case, there are two preliminary issues which cannot be overlooked. The first pertains to the burden of proof and the second is whether in determining the applicability of the pollution exclusion clause, the court may consider matters outside the complaint.

## A. Burden of Proof

 The first issue is the narrow one of who has the burden of proving the application of the sudden and accidental exception—the insurer or the insured. The general rule is that where recovery under a policy turns on the interpretation of an exclusionary clause, the insurer bears the burden of demonstrating that the loss is excluded under the express terms of the policy; and the parties do not dispute that. *McCormick & Co., Inc. v. Empire Ins. Group,* 878 F.2d 27, 30 (2d Cir.1989) (citations omitted). The difference here arises from the fact that the insurers are seeking to place an additional burden of proof on the insured, Colonial Tanning. Specifically, the insurers contend that it is Colonial Tanning's burden to prove that the sudden and accidental exemption from the pollution exclusion clause applies. Relying solely upon *Ludlow's Sand and Gravel Co. v. General Accident Insurance of America,* Vol. 5, No. 8 Mealey's Litigation Reports Insurance (N.D.N.Y. May 13, 1991), Colonial Tanning asserts that the insurers are wrongly trying to place the burden on it. In *Ludlow's Sand,* Judge McAvoy stated that the insurer bears the burden of proving the applicability of the exception to the pollution exclusion clause—and not the other way around. *Id.* at 37.

The Second Circuit has not yet had an opportunity to address this issue, and apparently the only reported New York case on this issue is one relied upon by Wausau. In particular, in *Borg–Warner v. Liberty Mutual Ins. Co.,* Vol. 5, No. 12, Mealey's Litigation Reports Insurance (Sup.Ct. Tompkins Co. January 24, 1991), the court observed, without offering any analysis of its own, that "[i]t appears that the insured would have the burden of proof...." *Id.* at 15 (citing *Fischer & Porter Co. v. Liberty Mutual Ins. Co.,* 656 F.Supp. 132, 140 (E.D.Pa.1986)). Several other courts outside this jurisdiction have addressed this issue, however, reaching opposite conclusions and offering different reasons for their decisions.

The courts which have found that the insured bears the burden of demonstrating

that the complained of event comes within the "sudden and accidental" exception have focused primarily on the fact that, in their view, even though the sudden and accidental exception falls within an exclusionary clause, it is an aspect of *coverage*. Some of the courts addressing this issue have relied upon a noted insurance law commentator, who has stated:

> [W]hen a policy contains an exception within an exception, the insurer need not negative the internal exception; rather, the plaintiff must show that the exception from the exemption from liability applies.

*United States Fidelity & Guaranty Co. v. Morrison Grain Co.*, 734 F.Supp. 437, 443 (D.Kan.1990) (quoting 19 G. Couch, *Couch on Insurance 2d* § 79.385 at 338 (1983)). In addition, one court carefully analyzed several factors to be considered in allocating the burdens of proof, such as fairness and public policy considerations, and placed the burden on the insured of proving that the sudden and accidental exception applied. *Fireman's Fund Ins. Companies v. Ex–Cell–O Corp.*, 702 F.Supp. 1317, 1328 (E.D.Mich.1988). The court in *Ex–Cell–O* held that such factors weighed heavily in the insurer's favor, and thus it put the burden on the insured of proving that the sudden and accidental exception applied.

On the other hand, the Third Circuit recently predicted that if the Delaware Supreme Court were confronted with this issue "[i]t would allocate the respective burdens of proof in accordance with the traditional distinction between coverage clauses and exclusionary clauses." *New Castle County v. Hartford Acc. and Indem. Co.*, 933 F.2d 1162, 1182 (3rd Cir.1991). Thus, the Court reasoned that "[b]ecause the 'sudden and accidental' exception is part of an exclusionary clause (the pollution exclusion clause) we believe that Delaware would impose on the insurer ... the burden of proving not only that the property damage at issue resulted from the discharge of pollutants, but also that the discharge was neither sudden nor accidental." *Id.* *See also United States Fidelity & Guaranty Co.*, 734 F.Supp. at 443.

Given those conflicting precedents, it is a close call as to where the burden of proof should be allocated in this case. The fact that New York courts have routinely construed exclusionary clauses against the insurer augurs in favor of the conclusion that, if faced with the issue, the New York Court of Appeals would not depart from the traditional burden of proof allocations in insurance case. That is, generally it is the rule in New York that:

> Once the insured shows that a [covered] loss has occurred, the insurer shoulders the burden of demonstrating that the loss claimed is excluded expressly from coverage under the policy terms....

*McCormick*, 878 F.2d at 30 (*quoting M.H. Lipiner & Son, Inc. v. The Hanover Ins. Co.*, 869 F.2d 685, 687 (2d Cir.1989)). Thus, as did the Third Circuit in *New Castle*, this court holds that because, in allocating burdens of proof in insurance cases, New York follows the traditional distinction between coverage clauses and exclusionary clauses, and because the sudden and accidental exclusion is part of an overall exclusionary clause, these insurers have the burden of demonstrating that the discharge was neither sudden nor accidental for that exception to apply.

### B. Four–Corners Rule

■ The next issue is whether, in considering the applicability of the sudden and accidental exclusion, the court should look at matters other than the DEC complaint. Liberty Mutual and Wausau argue that the court should; Home Indemnity takes no position, but limits its memorandum of law to an examination solely of the facts as alleged in the DEC complaint. Therefore, presumably Home Indemnity agrees with Colonial Tanning that the court cannot look beyond the four corners of the complaint in determining the duty to defend.

As it did with the suit issue, Colonial Tanning basically argues that because of the Magistrate Judge's order and this court's affirmation of that order, the court cannot look at allegations and/or other extrinsic proof beyond the DEC complaint. After discussing the relevant New York

law, Magistrate Judge DiBianco specifically held:

> [t]he determination of whether the defendants in the instant case have a duty to defend in the DEC proceeding should be made *solely by comparing the applicable policy provisions to the DEC complaint,* now that a complaint has been obtained. *Consideration of matters beyond the underlying complaint and the policy provisions would be improper in deciding the issue.*

Deutsch Affidavit, Ex. A thereto at 9 (emphasis added). In fact, it is precisely because of that holding that the Magistrate Judge refused to allow the insurers to obtain additional discovery. *Id.* This court affirmed the Magistrate Judge's order in its entirety. Therefore, this court declines to look outside the four corners of the complaint in determining whether the insurers have a duty to defend here.

■ Indeed, even though, as Liberty Mutual and Wausau point out, there is case support for the proposition that a court need not ignore positive proof, extrinsic to the complaint, that assists in clarifying an ambiguous allegation,[46] this court has previously rejected that proposition. In *New York v. Blank,* 745 F.Supp. 841 (N.D.N.Y. 1990), a case thoroughly discussed by the parties, but with no mention of this holding, this court expressly stated:

> The insurers' novel analysis of the law simply does not comport with the vast majority of the New York Court of Appeals case law concerning the duty to defend and, in this court's opinion, would not be accepted by the Court of Appeals today. Therefore, this court will not review the substantial amount of evidence which has been put forward by Capital Mutual to support its position that there is no duty to defend.

*Id.* at 849. This court refuses to retreat from its prior holding and consider the extensive documentation, beyond the DEC complaint, relied upon by the insurers herein. The court's refusal to consider extrinsic evidence on this issue is particularly appropriate given the Second Circuit's recent recognition of the rule in New York that "[a] liability insurer has a duty to defend its insured in a pending lawsuit if the pleadings allege a covered occurrence, *even though facts outside the four corners of those pleadings indicate that the claim may be meritless or not covered.*" *New York v. Amro Realty Corp.,* 936 F.2d 1420, 1429 (2d Cir.1991) (emphasis added) *(quoting Fitzpatrick v. American Honda Motor Co.,* 78 N.Y.2d 61, 571 N.Y.S.2d 672, 575 N.E.2d 90 (1991).

### C. Sudden and Accidental

■ Having said all this, the court can now focus its attention on the issue of whether the insurers can be excused from their duty to defend based upon the pollution exclusion clause.[47] The resolution of that issue turns upon whether there are any "indications" in the DEC complaint that the discharge, dispersal, release or escape of pollutants was sudden and accidental. *See Ogden Corp. v. The Travelers Indem. Co.,* 924 F.2d 39, 41 (2d Cir.1991). If there are such indications, the insurers would have a duty to defend; otherwise, they would not.

The DEC complaint is relatively short (five pages). The most significant allegation for purposes of this analysis is paragraph five, which reads as follows:

> Upon information and belief, until at least November, 1985, liquid spills or waste products from Respondent's [Colonial Tanning] tanning process drained through floor drains and from broken or unlined channels in its facility directly into the ground beneath Respondent's facility.

---

**46.** *See, e.g., Moreau v. Orkin Exterminating Co.,* 165 A.D.2d 415, 418, 568 N.Y.S.2d 466, 468 (3rd Dep't 1991); *Technicon Electronics v. American Home Assur. Co.,* 74 N.Y.2d 66, 544 N.Y.S.2d 531, 542 N.E.2d 1048 (1989) (court looked at answer in underlying action as well in decided whether conduct was accidental).

**47.** At oral argument, Colonial Tanning conceded that in the absence of the sudden and accidental exception, the pollution exclusion clause would bar its claims here.

Harding Affidavit, Ex. B thereto at 2. There are allegations that in October, 1986, and in January, 1987, ground waters taken from Colonial Tanning's facility revealed the presence of solvents and contaminants exceeding allowable levels. *See id.,* Ex. B thereto at 2–3. Other than those allegations, however, there are no other references to time in the complaint. By way of illustration, the complaint is completely silent as to when the alleged contamination started or ended. Of equal significance is the fact that conspicuously absent from the complaint are any explicit allegations that the liquids or waste products entered the environment through a sudden release or by accident. Nor are there any allegations that Colonial Tanning itself continually and intentionally polluted.

In *Avondale,* the Second Circuit outlined the scope of an insurer's duty to defend under New York law:

> An insurer's duty to defend and to indemnify are separate and distinct, and the former duty is broader than the latter.... The duty to defend rests solely on whether the complaint in the underlying action contains *any allegations that arguably or potentially bring the action within the protection purchased* ... So long as the claims alleged against the insured rationally may be said to fall within the policy coverage, the insurer must come forward and defend....

*Avondale,* 887 F.2d at 1204 (citations omitted) (emphasis added). In addition, in *Ogden,* the Second Circuit again stated the well settled rule that: "[t]here is no duty to defend, ..., if the insurer establishes that the 'allegations of the complaint cast that pleading *solely and entirely within the policy exclusion,* and, further, that the allegations, *in toto,* are *subject to no other interpretation.'* " *Ogden,* 924 F.2d at 41 (*quoting International Paper Co. v. Continental Cas. Co.,* 35 N.Y.2d 322, 325, 361 N.Y.S.2d 873, 875, 320 N.E.2d 619, 620–21 (1974)) (emphasis added). Thus, in general, New York courts have made it extremely difficult, although not impossible, for an insurer to escape its defense obligations.

Just how difficult it is for insurers to avoid defending their insureds in these situations was demonstrated by the Second Circuit in *Avondale.* There the insureds were charged with the following: " '[i]nsufficient' containment measures; ... 'generating' hazardous waste; ... 'knowledge' of the presence of toxins; ... culpability for 'escape' of hazardous materials." *Avondale,* 887 F.2d at 1205. The Court held that given those "conclusory assertions," which did not " 'clearly negate' the possibility that discharge or escape was 'sudden and accidental,' " the insurer had a duty to defend. *Id.* at 1205–06.

With those general principles in mind, after carefully examining the allegations in the underlying DEC complaint, the court must conclude that the insurers cannot avoid defending Colonial Tanning in the DEC proceeding on the basis of the pollution exclusion clause. Given the open-ended nature of the DEC complaint, and in particular paragraph five, the court believes that there is a possibility that the alleged contamination occurred over a short period of time; and thus that it was "sudden." In addition, the complaint can also be read as alleging that the contamination was accidental because there are no allegations that the contamination was in any way intended; that is, there are no allegations that Colonial Tanning engaged in this contamination knowingly or willfully. Thus, as in *Avondale,* the complaint here does not "clearly negate" the possibility that the releases were sudden and accidental.

In fact, based upon the vague allegations in the DEC complaint, it is *possible* that this is a situation like that presented in *Colonie Motors v. Hartford Acci. & Indem. Co.,* 145 A.D.2d 180, 538 N.Y.S.2d 630 (3rd Dep't 1989), where the court found a sudden and accidental discharge because there was nothing to suggest that the plaintiff was aware of a crack in a containment unit or the discharge until waste oil was discovered in the ground water of adjacent property. *Id.* at 182–83, 538 N.Y.S.2d at 632. Moreover, the allegations of the DEC complaint do not come "solely and entirely" within the pollution exclusion clause because they are certainly subject to

an interpretation of sudden and accidental, which means that coverage should be afforded. Consequently, the pollution exclusion clause does not provide a means by which these insurers can avoid their duty to defend.

## D. Absolute Pollution Exclusion Clause

The same is not true, however, with respect to the absolute pollution exclusion clause contained in Liberty Mutual's policies for the years 1986–89. As previously mentioned, that clause excludes coverage of *all* damage caused by pollution. Although Colonial Tanning did not address this argument in its papers, at oral argument it stated that it does not dispute the applicability of the absolute pollution exclusion clause found in certain of Liberty Mutual's policies. Colonial Tanning argued, however, that the application of that clause is irrelevant because Liberty Mutual insured Colonial Tanning under other policies which did not contain such a provision.

The broad language of the absolute pollution exclusion clause itself, and the manner in which it has been applied by New York courts,[48] warrants a finding that, with respect to the coverage years 1986–89, Liberty Mutual has no duty to defend Colonial Tanning. As will be seen, however, what appears at first glance to be a minor victory for Liberty Mutual is really academic.

## III. Existence of the Policies

■ Home Indemnity is the only insurer asserting that it has no duty to defend because Colonial Tanning has failed to provide complete copies of all of the policies issued by Home Indemnity under which Colonial Tanning allegedly has coverage. Specifically, Home Indemnity contends that Colonial Tanning has failed to prove the terms and conditions of four of the subject policies—those for the years 1971–74, 1977–78, 1978–79, and 1980–81. Colonial Tanning has provided complete copies of the policies for the years 1974–77 and 1979–80, however.

■ Home Indemnity is correct in stating that to establish the duty to defend, under New York law, a plaintiff must prove the terms and conditions under which that alleged duty arises. *Burroughs Wellcome Co. v. Commercial Union Ins. Co.,* 632 F.Supp. 1213, 1222 (S.D.N.Y.1986). Home Indemnity conveniently ignores the fact, however, that, as Colonial Tanning points out, the *Burroughs* court allowed secondary evidence to prove the existence of policies where the originals were lost or destroyed, and there was no evidence of bad faith by the insured. *Id.* at 1223. In *Burroughs,* after reviewing the applicable evidentiary standards, the court allowed the introduction of secondary evidence to prove the existence of the policies where, through an affidavit filed on behalf of the insured, it was shown that the insured undertook a "diligent but unsuccessful search and inquiry" for the subject policies. *Id.*

Likewise, in the present case, Colonial Tanning, "after a thorough search," has come forth with all of the evidence in its possession pertaining to the existence of policies issued to it by Home Indemnity. *See* Studenic Affidavit at ¶¶ 13–18. Therefore, under these circumstances, the fact that Colonial Tanning has not come forth with complete copies of the policies issued to it by Home Indemnity is not a sufficient basis for denying its partial summary judgment motion.

Additionally, while it is true that under New York law the insurer has the burden of proving any exclusions, *Emons Industries, Inc. v. Liberty Mut. Fire Ins. Co.,* 545 F.Supp. 185, 189 (S.D.N.Y.1982) (citations omitted), none of these insurers are disputing the *existence* of the pollution exclusion clause itself. Rather, they assert that that clause precludes coverage. Thus, the fact that complete copies of the policies are not before the court is immaterial, especially given the fact that the portions of the subject policies Colonial Tanning pro-

---

**48.** *See, e.g., Budofsky v. Hartford Insurance Co.,* 147 Misc.2d 691, 556 N.Y.S.2d 438 (Sup.Ct., Suffolk Co.1990) and *O'Connor v. The City of New* York, No. 18384 Slip Op. 3 (Sup.Ct., Bronx Co. 1989).

vided to the court contain the controversial provisions.[49]

 Finally, it should be noted that where the underlying complaint states claims even "potentially" within the effective period of *any* of an insurer's policies, an insurer is then obligated to defend the entire action. *See Emons Industries, Inc. v. Liberty Mut. Fire Ins. Co.*, 481 F.Supp. 1022, 1026 (S.D.N.Y.1979) (emphasis added); *see also New York v. Amro Realty Corp.*, 697 F.Supp. 99, 102 n. 5 (N.D.N.Y. 1988), *mod'd*, 936 F.2d 1420 (2d Cir.1991) (observing that because the complaint alleged pollution occurring within the policy years, *as well as others*, the insurer had a duty to defend). Thus, even though, as already discussed, the absolute pollution exclusion clause contained in some of the Liberty Mutual policies would ordinarily preclude coverage by that insurer, Liberty Mutual cannot escape its defense obligations on that basis. That is so because Colonial Tanning's claims *may* come within the effective periods of the other Liberty Mutual policies, which did not contain the absolute pollution exclusion clause.

## IV. Occurrence

 Home Indemnity is also the only insurer arguing that the DEC complaint does not allege an occurrence as that word is defined in the CGL policy, and thus Colonial Tanning is not entitled to partial summary judgment on the duty to defend. The policies issued by Home Indemnity provide, in relevant part:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
> A. bodily injury or
> B. property damage
> to which this insurance applies, caused by an occurrence,....

Affidavit of Judith Sayles (September 13, 1991), Ex. B and E thereto. The policies, in turn, define an occurrence as follows:

> "Occurrence" means an *accident,* including continuous or repeated exposure to conditions, which result in bodily injury or property damage neither expected nor intended from the standpoint of the insured....

*Id.* (emphasis added).

In *Johnstown v. Bankers Standard Ins. Co.*, 877 F.2d 1146 (2d Cir.1989), a case properly relied upon by Colonial Tanning, the Second Circuit extensively discussed New York law interpreting the common insurance policy definition of occurrence. *See id.* at 1149–51. Several aspects of that discussion are particularly relevant here. The first is the Court's definition of accidental:

> In attempting to define what events are 'accidental,' the New York courts have focused on the nexus between an intentional act and the resulting damage. As this court has observed, a distinction is drawn between 'damages which flow directly and immediately from an intended act, thereby precluding coverage, and damages which accidentally arise out of a chain of unintended though expected or foreseeable events that occurred after an intentional act. Ordinary negligence does not constitute an intention to cause damage; neither does a calculated risk amount to an expectation of damage....'

*Id.* at 1150 (*quoting Brooklyn Law School v. Aetna Casualty & Sur. Co.*, 849 F.2d 788, 789 (2d Cir.1988)). The second important observation by the Court in *Johnstown* is that "[t]hough an *intentional* act may ultimately cause certain damages those damages may, under New York law, be considered 'accidental' if the 'total situation could be found to constitute an accident.'" *Id.* (*quoting McGroarty v. Great Am. Ins. Co.*, 36 N.Y.2d 358, 365, 368 N.Y.S.2d 485, 490, 329 N.E.2d 172, 175–76 (1975)) (emphasis in original). Third, the Court stated, "[r]ecovery will be barred only if the insured intended the damages, ... or if it can be said that the damages

---

**49.** This is not like the situation in *New York v. Blank,* (N.D.N.Y. January 24, 1989), where this court denied, without prejudice to renew, a motion regarding the duty to defend because there were *no* copies or portions of the necessary policies. *See* Plaintiff's Memorandum of Law, Ex. A (transcript) thereto at 6–7.

were, in a broader sense, 'intended' by the insured because the insured knew that the damages would flow directly and immediately from its intentional act,...." *Id.* at 150–51 (citations omitted).

Based upon those guidelines, it is apparent, as it was in *Johnstown,* that Home Indemnity, at least at this juncture, has failed to show that the environmental damage alleged in the DEC complaint was not accidental. The DEC complaint undoubtedly leaves open the possibility that the alleged contamination was accidental. Also, as in *Johnstown,* nowhere in the DEC complaint does it allege that Colonial Tanning intended the environmental harm attributed to it therein. Nor are there any allegations that Colonial Tanning knew that the environmental damage would "flow directly and immediately" from its acts. Indeed, the court can envision a scenario where, because the alleged releases were through floor drains, directly into the ground, Colonial Tanning was not even aware of those releases. Thus, the court cannot agree with Home Indemnity that the DEC complaint does not allege an occurrence within the meaning of the policy.

*V. Damages*

All three insurers contend that the DEC complaint does not allege damages as that term is used in the CGL policies at issue. Therefore, the insurers believe that Colonial Tanning's motion for partial summary judgment must be denied on that ground. The CGL policies state that the insurer will pay "all sums which the insured shall become legally obligated to pay as damages because of (A) bodily injury or (B) property damage to which this insurance applies caused by an occurrence...." *See, e.g.,* Sayles Affidavit, Exs. B and E thereto. Property damage is defined in those policies as:

(1) Physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom; or

(2) Loss of use of tangible property which has not been physically injured or destroyed, provided such loss of use is caused by an occurrence during the policy period.

*Id.*

The primary argument by the insurers is that the DEC complaint alleges that Colonial Tanning will be required to make equitable relief, and such relief does not come within the meaning of damages under these policies. Secondly, Wausau and Home Indemnity contend that, through the DEC proceeding, Colonial Tanning is simply doing what it is required to do to comply with a state regulatory scheme. Thus, in their view, any costs incurred by Colonial Tanning in that connection are not damages.

The insurers discuss numerous cases from other jurisdictions [50] to support their assertion that the DEC complaint seeks equitable relief, thus precluding a finding of damages for insurance defense purposes. The court is well aware of this authority, but it is not inclined, especially after its broad hint in *Amro* that it would consider CERCLA cleanup costs as damages, to agree with the insurers on this point. *See Amro,* 697 F.Supp. at 102, n. 5, *mod'd,* 936 F.2d 1420 (2d Cir.1991). Moreover, in *Avondale* the Second Circuit unequivocally held that the insured was obligated to defend where the alleged polluter might be held liable for environmental cleanup costs. The Second Circuit gave two reasons for its holding. The first was that the word damages was not defined anywhere in the policy. Given that fact, the Court reasoned that damages must be construed to include remedial costs imposed upon Avondale by the state. Second, the Court believed that, "[a]n ordinary business[person] reading this policy would have believed himself [or herself] covered for the demands and potential damage claims now being asserted in the ... ad-

---

**50.** *See, e.g., Continental Ins. Cos. v. Northeastern Pharmaceutical and Chemical Co.,* 842 F.2d 977 (8th Cir.1988) (*en banc*), *cert. denied,* 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988); *Mary-* *land Casualty Co. v. Armco, Inc.,* 643 F.Supp. 430 (D.Md.1986), *aff'd,* 822 F.2d 1348 (4th Cir. 1987), *cert. denied,* 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988).

ministrative proceeding." *Id.* (citing *Allstate Ins. Co. v. Klock Oil Co.*, 73 A.D.2d 486, 489, 426 N.Y.S.2d 603 (4th Dep't 1980)).

The court realizes that the insurers strongly believe that *Avondale* was wrongly decided—on this issue and others. The court points out, however, that with respect to this damages issue, the Second Circuit in *Avondale* specifically rejected the decisions of the Eighth and Fourth Circuits relied upon, in part, by the insurers in the present action. *Id.* Thus, it is not as though the *Avondale* Court engaged in its analysis without realizing that other Circuits have held differently; it recognized the existence of contrary authority and chose *not* to follow it.

Wausau and Home Indemnity proffer another reason as to why Colonial Tanning cannot satisfy the damages requirement of the subject policies; that is that in the underlying proceeding, the state, by the DEC, is simply exercising its police powers. Therefore, Wausau and Home Indemnity contend that any costs incurred by Colonial Tanning in complying therewith are· not damages. Neither the Second Circuit in *Avondale* nor the New York state courts have explicitly considered the police powers argument urged by these insurers.

In *New York v. Exxon Corp.*, 932 F.2d 1020 (2d Cir.1991), a case heavily relied upon by Wausau, the Second Circuit did hold, though, that a city's action under CERCLA to recover cleanup costs falls within the police or regulatory power exception to the automatic stay provision of the bankruptcy code. The court is not prepared to embrace that police powers argument based upon *Exxon*, however, because, as Wausau acknowledged at oral argument, the Second Circuit's holding arose in a factually different context—specifically, in the context of the automatic stay provision of Chapter 11 of the Bankruptcy Code. Moreover, given the broad language in *Avondale*, this court is not persuaded that in the future, the Second Circuit would rely upon its decision in *Exxon* to disallow a finding of damages under facts such as those presented by this case. Indeed, the Second Circuit's recent decision in *Gerrish Corp. v. Universal Underwriters Insurance Co.*, 947 F.2d 1023 (2d Cir.1991), supports the court's view in this regard. In *Gerrish*, this time applying Vermont law, the Second Circuit held that environmental response costs associated with a gasoline leak could be considered damages under an insurance policy. *Id.* at 1030. The police powers argument did not enter into the Court's analysis there.

Lastly, based upon Colonial Tanning's representations at oral argument that it is not seeking indemnification for the $25,-000.00 civil penalty, the court need not address the insurers' contention that they have no duty to indemnify Colonial Tanning for that penalty.

## VI. Owned Property Exclusion

█ Home Indemnity, alone, asserts that the owned property exclusion obviates its defense obligations. Property damage to the following is explicitly excluded from coverage under the Home Indemnity policies:

(1) Property owned or occupied by or rented to the insured;

(2) Property used by the insured;

(3) Property in the care, custody, or control of the insured or as to which the insured is for any purpose exercising physical control; ....

Sayles Affidavit, Exs. B and E thereto. Based upon that language, Home Indemnity contends that in the absence of allegations of property damage to the property of third parties, Colonial Tanning's partial summary judgment motion should be denied and the cross-motion by Home Indemnity should be granted. Colonial Tanning's response is a simple one: the owned property exclusion does not apply to suits, such as the DEC proceeding, alleging "abatement remedies".

Any doubt regarding the inapplicability of the owned property exclusion has been resolved by the Second Circuit's recent decision in *Gerrish*, wherein the Court affirmed the district court's holding that the insurer could not avoid coverage, by relying upon the owned property exclusion, for

cleanup costs of property damage caused by a plume of petroleum product. The Court explained:

> While the specific effects of this pollution migration have not been provided, such effects are not required in this declaratory judgment action. It is only proof of damage to property not owed, controlled or possessed by Gerrish [the insured] that must be proffered.

*Gerrish*, at 1030. Along those same lines, in an earlier decision, the district court in *Boyce Thompson Instit. for Plant Research v. Insurance Co. of North America*, 751 F.Supp. 1137 (S.D.N.Y.1990), held that "[s]o long as the ... complaint contains allegations that encompass the possibility that off-site contamination exists or that the clean-up was performed to prevent damage to the property of third parties, the owned property exclusion would *not* be applicable to work done on the property." *Id.* at 1141 (emphasis added).

After *Gerrish*, it is clear that in this Circuit it will be extremely difficult for an insurer to avoid its defense obligations in a case such as this, by resorting to the owned property exclusion. As in *Gerrish*, the allegations in the DEC complaint at issue here allege ground water pollution. Specifically, the complaint alleges that "[t]he level of mineral spirits found in the ground waters beneath its facility impaired the quality of such ground water to render them unsafe for or unsuitable for a potable water supply." Harding Affidavit, Ex. B thereto at 3, ¶ 10. The complaint further alleges that mineral spirits were "released from and found in the ground waters beneath Respondent's [Colonial Tanning's] facility,...." *Id.*, Ex. B thereto at 3, ¶ 14. The complaint also demands that Colonial Tanning implement a RI/FS "[t]o determine the nature and the horizontal and vertical extent of the contamination at, and migrating from Respondent's [Colonial Tanning's] facility," and "an evaluation of feasible alternatives for the permanent remediation of the contamination at, and migrating from Respondent's [Colonial Tanning's] facility, ..., and a remedial program, ..., that will permanently abate the contamination at, and migrating from Re-

spondent's [Colonial Tanning's] facility, and will protect the public health and the environment." *Id.*, Ex. B thereto at 4, ¶ III. Those allegations are obviously sufficient to defeat Home Indemnity's argument that it is entitled to rely upon the owned property exclusion as a basis for refusing to defend Colonial Tanning in the underlying DEC proceeding.

### VII. Counsel of Own Choosing

Home Indemnity is also alone in arguing that if it does have a duty to defend, Colonial Tanning is not entitled to the counsel of its own choosing. Although it did not address this issue in any of its memoranda of law, Colonial Tanning stated at oral argument that it believes that it should be allowed to choose its own counsel. Because all parties have not fully briefed this issue, and because the court sincerely hopes and believes that this relatively minor issue can be resolved without further court intervention, the court declines to resolve the representation issue at this juncture. And thus, insofar as Home Indemnity may be seeking summary judgment on this issue, that aspect of its motion is denied without prejudice to renew. If the parties are unable to amicably resolve this matter, then appropriate motions may be brought.

### VIII. Attorneys' Fees

Not wanting to leave any stone unturned, Home Indemnity also argues that Colonial Tanning is not entitled to an award of attorneys' fees for bringing this declaratory judgment action. Colonial Tanning takes no position. Perhaps Colonial Tanning did not refute Home Indemnity's argument on this issue because it realized that to do so would be futile. The law is well established in New York that an insured is *not* entitled to reimbursement of legal fees incurred in connection with the prosecution of a declaratory judgment action. *AFA Protective Systems, Inc. v. Atlantic Mut. Ins. Co.*, 157 A.D.2d 683, 686, 549 N.Y.S.2d 783, 786 (2d Dep't 1990) (citing *Mighty Midgets v. Centennial Ins. Co.*, 47 N.Y.2d 12, 416 N.Y.S.2d 559, 389 N.E.2d

1080 (1979); and *Johnson v. General Mut. Ins. Co.*, 24 N.Y.2d 42, 50, 298 N.Y.S.2d 937, 246 N.E.2d 713 (1969)). Thus, clearly Home Indemnity is right; Colonial Tanning is not entitled to recover from the insurers the attorneys' fees and costs which it incurred in bringing this declaratory judgment action.

### IX. No Indemnification Before November 6, 1990

 There is also an argument by the insurers that if this court finds a duty to defend, as it has, then that duty is limited in scope. More particularly, the insurers argue that Colonial Tanning is not entitled to indemnification for defense costs incurred prior to November 6, 1990—the date of the DEC complaint, and coincidentally, the same date Colonial Tanning signed the two consent orders. As Colonial Tanning correctly recognized, in *New York v. Blank*, 745 F.Supp. 841, (N.D.N.Y.1990), this court held that "[r]egardless of the actual date upon which the complaint was actually filed, Capital Mutual [the insurer] has an obligation to reimburse Blank [the insured] for services rendered which are useful in defending against the first-party complaint." *Id.* at 852. Likewise, in the present case, these insurers have an obligation to indemnify Colonial Tanning for services rendered by its present counsel which are useful in defending against the DEC complaint. The court is not prepared to say at this juncture, however, exactly what that amount will be, because the court has not been provided with the necessary information to make such a determination.

### X. Cross–Motions by Home Indemnity and Liberty Mutual

 Relying upon this court's most recent decision in *New York v. Blank*, 1991 WL 208883, 1991 U.S. Dist. LEXIS 14,582 (October 10, 1991), Colonial Tanning argues that the cross motion for summary judgment by Wausau [51] is premature reasoning that "[b]ecause discovery . . ., is on-going,

there is yet a possibility that the State will prove that Colonial Tanning's liability for sudden and accidental contamination." Plaintiff's Reply Memorandum of Law at 27. The court agrees. Thus, the cross-motions by defendants Wausau and Home Indemnity are denied.

In sum, the plaintiff's motion for partial summary judgment is hereby granted and the cross-motions for summary judgment by defendants Wausau and Home Indemnity are hereby denied without prejudice to renew.

IT IS SO ORDERED.

---

51. Colonial Tanning only mentioned in its reply brief the cross-motion by Wausau, but presumably it makes the same argument with respect to Home Indemnity.